JAMES B. AND MARGARET CAREY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5556–68.    Filed June 14, 1971.

*Ellis W. Manning, Jr.*, and *Lyman G. Friedman*, for the petitioners.
*Thomas C. Morrison*, for the respondent.

OPINION

TANNENWALD, *Judge:* The respondent determined a deficiency of $3,819.76 in petitioners' Federal income tax for the calendar year 1965. The principal issue for our consideration is whether James B. Carey (hereinafter sometimes referred to as petitioner) is entitled to deduct expenditures which he made in connection with an unsuccessful attempt to be reelected president of the International Union of Electrical, Radio, and Machine Workers, AFL–CIO–CLC (hereinafter referred to as the IUE).[1]

All of the facts have been stipulated, and the stipulation and exhibits attached thereto are incorporated herein by reference.

James B. and Margaret Carey, who are husband and wife, filed a joint a Federal income tax return for the calendar year 1965 with the district director of internal revenue, Baltimore, Md. At the time of the filing of their petition herein, they resided in Silver Spring, Md.

Petitioner has been active in the labor union movement since the early 1930's. During that period, he served as secretary, and then as secretary-treasurer, of the Congress of Industrial Organizations (CIO) from its formation in 1938 to its merger with the American Federation of Labor (AFL) in 1955. Following that merger, he served as secretary-treasurer of the AFL–CIO Industrial Union Department, as vice president of the AFL–CIO, and as a member of the executive committee and executive council of the AFL–CIO. He is presently director of labor participation for the United Nations Association of the United States.

From 1949 to 1965, petitioner was elected by acclamation to eight consecutive 2-year terms as president of the IUE, a major labor union. Petitioner, as chief executive officer of the IUE, was charged with responsibility for directing union affairs, which included presiding over conventions of the union and meetings of the union's executive board. Along with the district president of each district of the union, he was responsible for the maintenance and improvement of conditions of employment for those persons within the jurisdiction of the IUE.

The union's constitution set the president's maximum salary at $25,500 per year. In his 1965 return, petitioner reported receiving a salary of $25,499.76.

---

[1] The expenditures which were disallowed in the deficiency notice are detailed at p. 479 *infra*. Since petitioners have conceded that amounts paid in 1964 cannot be deducted in 1965 and respondent has conceded the deductibility of certain interest payments, we address ourselves only to the remaining expenditures.

Pursuant to the IUE constitution, the candidates for IUE president are nominated at the national convention. Election is by means of a referendum conducted by mail. At the 1964 convention, held in September of that year, Paul Jennings and petitioner were nominated for the presidency of the IUE. When the results of the referendum were finally tabulated, Jennings was declared the winner.

In December 1964, during the course of the counting of the ballots, Jennings filed suit in the United States District Court for the District of Columbia seeking to enjoin further vote tabulation until adequate safeguards were provided to insure accuracy. The defendants in this suit were the petitioner, the union trustees charged with supervision of the election, the IUE's secretary-treasurer, and the IUE itself. The complaint alleged, *inter alia*, that petitioner, as the incumbent president of the IUE, would not act impartially to insure an accurate tabulation of the votes. In defending against this action, which was dismissed, petitioner incurred expenses of $260 which were paid in 1965.

On their income tax return for the year 1965, petitioners deducted the following amounts as "Employee business expenses" which were incurred by petitioner as president of the IUE and which were disallowed by respondent in the deficiency notice:

| Date paid | Description | Amount |
|---|---|---|
| 9/29/64 | Petitioner's contribution to his campaign fund | [1] $680.16 |
| 9/30/64 | Petitioner Margaret Carey's contribution to petitioner's campaign fund | [1] 700.00 |
| 1/28/65 | Petitioner's personal assumption and payment of accrued but unpaid campaign fund expenses. | 14,108.19 |
| 1965 | Petitioner's payment of interest on $14,108.19 loan used to repay unpaid campaign expenses. | [2] 296.84 |
| 1965 | Petitioner's payment of legal fee in defending action brought by Paul Jennings. | 260.00 |
| 1965 | Petitioner's payment of accounting fee for election expense audit | 25.03 |
| Total | | 16,070.22 |

[1] Petitioners concede that these amounts are not proper deductions in the year 1965 only because they were in fact paid in 1964 and petitioners used the cash receipts and disbursements method of accounting for the year in question.
[2] Respondent concedes that, regardless of the outcome of the instant case, this amount is deductible under s c. 163, I.R.C. 1954.

We are again confronted—this time in the context of campaign expenditures made in the course of an unsuccessful attempt by petitioner to be reelected president of an international labor union—with the extent of the allowable deductions under sections 162 and 212.[2] In

[2] All references, unless otherwise specified, are to the Internal Revenue Code of 1954, as amended.
SEC. 162. TRADE OR BUSINESS EXPENSES.
   (a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *
SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.
   In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
      (1) for the production or collection of income ;

essence, the determination of this issue rests upon the extent to which our recent decision in *David J. Primuth*, 54 T.C. 374 (1970), or that of the Supreme Court in *McDonald v. Commissioner*, 323 U.S. 57 (1944), is applicable.

In *McDonald*, the Supreme Court held that the expenditures made by a State court judge, who had been given an interim appointment, in seeking election for a full term were not deductible under the predecessor of section 162 (sec. 23(a)(1), I.R.C. 1939[3]) on the ground that they were not incurred in the business of judging but "in trying to be a judge." See 323 U.S. at 60.

In reaching this decision, however, the Court strongly indicated its deep concern for the powerful considerations of public policy involved in allowing a deduction for expenses incurred in running for public office. Moreover, the Court emphasized the history of "disallowance of campaign expenses as consistently reflected by legislative history, court decision, Treasury practice and Treasury regulations." See 323 U.S. at 62.[4] As a consequence, and in light of the additional fact that the actual majority in *McDonald* was obtained by a simple concurrence in result by Mr. Justice Rutledge, it is questionable whether the legal theory espoused in the opinion of the Court has as wide an application as respondent would have us believe. Indeed, the Court itself indicated that the broad brush stroke of its opinion might be more apparent than real, when it stated that it would leave to this Court the "detailed analysis of the special circumstances of various 'businesses' and expenses incident to their 'carrying on' " and the consequent determination of the "allowed or disallowed deductions." See 323 U.S. at 65. It seems to us that the Court clearly left room for different results in different factual situations. Compare *Caruso v. United States*, 236 F. Supp. 88 (D.N.J. 1964).

It was in the spirit of this qualification to the thrust of *McDonald* that our decision in *Primuth* was rendered. In that case, we allowed the

---

[3] The decision in *McDonald* was based on the provisions of the Internal Revenue Code of 1939. However, insofar as this case is concerned, the 1939 Code provisions are identical to provisions of the Internal Revenue Code of 1954. Compare sec. 23(a)(1) and sec. 23(a)(2), I.R.C. 1939, with sec. 162(a) and sec. 212(1), I.R.C. 1954.

[4] Since *McDonald*, the deductibility of campaign expenditures has been uniformly denied. *Maness v. United States*, 367 F. 2d 357 (C.A. 5, 1966) ; *Shoyer v. United States*, 290 F. 2d 817 (C.A. 3, 1961) ; *Mays v. Bowers*, 201 F. 2d 401 (C.A. 4, 1953). See also *Long v. Commissioner*, 277 F. 2d 239 (C.A. 8, 1960) ; *Davenport v. Campbell*, 238 F. Supp. 568 (N.D. Tex. 1964) ; *William H. Maness*, 54 T.C. 1602 (1970) ; *Ronald W. Sholund*, 50 T.C. 503 (1968). Compare *Vernon v. Commissioner*, 286 F. 2d 173 (C.A. 9, 1961), affirming per curiam a Memorandum Opinion of this Court; *Robert Edward Kleinschmidt*, 12 T.C. 921 (1949). Similarly, Congress has continued to evidence a national policy of denying tax benefits to expenditures made in connection with political campaigns, including unsuccessful efforts in recent years, too numerous to detail, to obtain the enactment of legislation permitting the limited deduction of contributions to political parties. See secs. 271 and 276. See also 4A Mertens, Law of Federal Income Taxation (Riordan rev.) secs. 25.38 and 25.135.

deduction, under section 162, of employment agency fees paid by the taxpayer in the course of obtaining a new position of a type similar to the one he occupied. In so doing, we emphasized that such an expense "must be deemed ordinary and necessary from every realistic point of view in today's marketplace" and that "the business expenses which an employee can incur in his own business are rare indeed." See 54 T.C. at 379. Moreover, we noted that the expenditures involved were in an area in which respondent's rulings had constructed cloudy distinctions. See 54 T.C. at 380 and concurring opinions at 383 and 384.

The critical question is whether, in light of the foregoing, the campaign expenditures herein are more analogous to the expenses in *McDonald* or to the expenses in *Primuth*. Unlike employment agency fees, we do not think that common understanding in the ordinary affairs of life would consider that campaign expenditures should be encompassed as "ordinary and necessary expenses * * * in carrying on any trade or business" (sec. 162) within the "usual, ordinary and everyday meaning of the term." See *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 561 (1932). Under these circumstances, even taking into account whatever flexibility *McDonald* may allow by charging us with "detailed analysis" of various situations (see p. 480 *supra*), we think that the frame of reference herein is so closely analogous that the thrust of *McDonald* is highly persuasive in favor of the conclusion that petitioner's expenditures fall within *McDonald* and should therefore not be deductible.

We are not impressed with petitioners' argument that the absence herein of the public policy considerations which underlay *McDonald* should be determinative. Aside from the fact that we would be inclined to apply *McDonald* without regard to those considerations, we think that a comparable public policy element is involved in this case.

The impact of labor unions in our modern industrial society is obvious. Deep legislative concern over the internal operations of labor unions, especially union elections, is evidenced by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U.S.C. sec. 401 *et seq.* (hereinafter the Labor-Management Act of 1959). That Act enacted into law provisions covering some 35 subjects in the areas of public disclosure of union internal and financial affairs, falsification and destruction of union records; financial transactions, holdings, and expenditures by union officials and employees; involvement in union activities of persons with criminal records; standards for the establishment of union trusteeships and public disclosure and court proceedings in connection therewith; and union elections.

Eleven of these provisions deal directly with union elections (73 Stat. 519, 533–534, 29 U.S.C. secs. 481–483) in the following manner:

(23) Requires election of constitutional officers and members of executive boards of international unions at least every 5 years by secret ballot or by delegates elected by secret ballot;

(24) Requires election of constitutional officers and members of executive boards of local unions at least every 3 years by secret ballot;

(25) Protects freedom of opportunity to nominate candidates in union elections;

(26) Protects members' right to vote in union elections without being subject to improper interference or reprisals;

(27) Insures that every candidate for union office shall be afforded the opportunity to distribute at his own expense literature in support of his candidacy to all the members of the union;

(28) Requires that all candidates shall have the opportunity to have observers present at the balloting and at the counting of the ballots in a union election;

(29) Prohibits use of union funds to promote individual candidacy in union elections;

(30) Procedures whereby a union officer guilty of serious misconduct in office may be removed by a secret ballot vote after court proceedings if the union's constitution does not provide adequate machinery for such removal;

(31) Provides for investigations by the Secretary of members' complaints of improper procedures in union elections and court actions by the Secretary to set aside improperly conducted elections;

(32) Empowers Federal courts to direct new elections to be conducted under supervision of the Secretary where it finds union election was improperly conducted;

(33) Preserves members' rights to enforce union's constitution under State laws with respect to trusteeships and safeguarding fair procedures before an election. [S. Rept. No. 187, to accompany S. 1555, 86th Cong., 1st Sess. (1959), 2 U.S. Cong. & Adm. News 2320 (1960).]

The House report states that labor unions are "a balancing force in our free economy." H. Rept. No. 741, to accompany H.R. 8342, 86th Cong., 1st Sess. (1959) [2 U.S. Cong. & Adm. News 2476 (1960)]. It further states that the 1959 legislation was needed because:

The relationship of the leaders of such unions to their members has in some instances become impersonal and autocratic. In some cases men who have acquired positions of power and responsibility within unions have abused their power and forsaken their responsibilities to the membership and to the public. The power and control of the affairs of a trade union by leaders who abuse their power and forsake their responsibilities inevitably leads to the elimination of efficient, honest and democratic practices within such union, and often results in irresponsible actions which are detrimental to the *public interest*. [Emphasis added. 2 U.S. Cong. & Adm. News at 2428.]

And, as regards union elections, the report states:

The Government which gives unions this [bargaining] power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. One of the best assurances which can be given is a legal guaranty of free and periodic elections. The responsiveness of union

officers to the will of the members depends upon the frequency of elections, and an honest count of the ballots. Guaranties of fairness will preserve the *confidence of the public* and the members in the integrity of union elections. [Emphasis added. 2 U.S. Cong. & Adm. News at 2438.]

The Senate report reflects similar sentiments:

The internal problems currently facing our labor unions are bound up with *a substantial public interest.* Under the National Labor Relations Act and the Railway Labor Act, a labor organization has vast responsibility for economic welfare of the individual members whom it represents. Union members have a vital interest, therefore, in the policies and conduct of union affairs. To the extent that union procedures are democratic they permit the individual to share in the formulation of union policy. This is not to say that in order to have democratically responsive unions, it is necessary to have each union member make decisions on detail as in a New England town meeting. What is required is the opportunity to influence policy and leadership by free and periodic elections. [Emphasis added. S. Rept. No. 187, to accompany S. 1555, 86th Cong., 1st Sess. (1959), 2 U.S. Cong. & Adm. News at 2323.]

Obviously, a labor union office is not literally a public office. Nevertheless, against the background outlined above, we believe that the presidency of a large international labor union is akin to a public office so that the considerations emphasized in *McDonald* and its progeny, while not determinative, may properly be taken into account herein.[5] We are satisfied that those considerations—reflecting as they do the view that the election process is a sensitive element in the fabric of our democratic way of life—constitute a national policy which falls within the narrow delineation of the standard of nondeductibility set forth in *Commissioner* v. *Tellier*, 383 U.S. 687 (1966).

We hold that the campaign expenditures of petitioner are not deductible under section 162. Moreover, since the same policy considerations are involved, and more particularly since section 212 merely enlarges the categories of incomes with reference to which expenses are deductible and not the range of allowable types of deductible expenses, those expenditures are not deductible under that section. *McDonald* v. *Commissioner*, 323 U.S. at 62–63. If a deduction is to be sanctioned, we think that the course of history and the paramount importance of the proper functioning of the election process, insofar as it involves not only public offices but offices of labor unions encompassed by the Labor-Management Act of 1959, demands that Congress should unequivocally so provide. Cf. *Mays* v. *Bowers*, 201 F. 2d 401, 403 (C.A. 4, 1953). See also fn. 4 *supra.*

We have no need at this point to address ourselves to the question of how far such public policy considerations should extend to other

---

[5] We are not suggesting that such a point of view should be adopted in respect of every union office. In *Ernest H. Vernon,* T.C. Memo. 1959–189, affirmed per curiam 286 F. 2d 173 (C.A. 9, 1961), we indicated that the office of business representative of a local union did not constitute a public office.

types of elections. We note, however, that a deduction has been allowed, at least within the context of section 212, for expenses incurred by individuals in connection with general corporate proxy solicitation expenses. See *Graham* v. *Commissioner*, 326 F. 2d 878 (C.A. 4, 1964) ; *Surasky* v. *United States*, 325 F. 2d 191 (C.A. 5, 1963) ; Rev. Rul. 236, 1964–2 C.B. 64. We also note that congressional regulation of such solicitation does not seem to have extended as far as has congressional regulation of union elections. Compare 29 U.S.C. sec. 481(g) with Stock Exchange Regulation, Hearings before House Committee on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720, 73d Cong., 2d Sess., p. 141 (1934), and SEC Enforcement Problems, Hearings before a subcommittee of Senate Committee on Banking and Currency, 85th Cong., 1st Sess., p. 115 (1957). Cf. 15 U.S.C. sec. 791(e) and rule U–65 issued thereunder.

Under the circumstances of this case, there also is no need to delve into the question whether there should be a distinction between an "in" candidate and an "out" candidate and the elements of advantage that such a distinction would confer on an incumbent. Similarly, since the point was not argued by either party, we do not consider whether the fact that a fixed term of office was involved might convert an expenditure such as is involved herein, if it were otherwise deductible, into an amortizable capital item in the case of a successful candidacy or an abandonment loss in the case of an unsuccessful candidacy. Cf. *Maness* v. *United States, supra; Mays* v. *Bowers, supra.*

Petitioner, however, is entitled to deduct the costs incurred in defending the action brought by Jennings. Petitioner was not joined as a defendant simply because he was Jennings' opponent in the election. It was his position as the incumbent president of the IUE and Jennings' allegation that petitioner, in performing his duties as an officer, was not abiding by the IUE's constitution that was the basis of the legal action.[6] As such, the expenses were incurred because of an alleged illegal quality attributed to acts which were being performed by petitioner in the business of being the IUE president. It is well established that such expenses constitute ordinary and necessary business expenses deductible under section 162. *Commissioner* v. *Tellier, supra; United*

---

[6] The IUE constitution entrusts supervision of elections to five trustees. (Art. XXII, secs. G–L.) The trustees are charged with sole custody of ballots (sec. G), tabulating the vote (sec. H), making an initial determination of the legality of ballots received (sec. J), and reporting the results of the election to the secretary-treasurer of the IUE (sec. I). If the legality of any ballots is contested, a final determination is made by the IUE Executive Board (sec. J). But see 73 Stat. 519, 534, 29 U.S.C. sec. 482. Although it is not altogether clear, it appears that Jennings' complaint, in part, was concerned with petitioner's role as chairman of the IUE Executive Board and his influence on its ruling on contested ballots.

*States* v. *Gilmore*, 372 U.S. 39 (1963) ; *Peoples-Pittsburgh Trust Co.*, 21 B.T.A. 588 (1930) ; affd. 60 F. 2d 187 (C.A. 3, 1932).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM, *J.*, did not participate in the consideration or disposition of this case.

---

TIETJENS, *J.*, concurring: I agree in the result here. However, I do not think we have to go around Robin Hood's Barn to keep from opening up Pandora's Box as envisioned in Judge Tannenwald's concurring opinion in *David J. Primuth*, 54 T.C. 374. This case may or may not depend on what we said in *Primuth*. If it does, I think *Primuth* was wrong—as I said in my dissent in *Primuth*, *supra*, and repeated in my concurrence in *Guy R. Motto*, 54 T.C. 558. But I think this case fits precisely in the mold of *McDonald* v. *Commissioner*, 323 U.S. 57; *Vernon* v. *Commissioner*, 286 F. 2d 173; and *Mays* v. *Bowers*, 201 F. 2d 401—without reliance on "public policy." I am not sure how much "public policy" had to do with the Supreme Court's decision in *McDonald*. It was a close decision. I have some doubt about what the basis of the conclusion there was, but I'd rather have the Supreme Court take another look at it, than have us try to get around *Primuth* here by saying that "public policy" dictated the result in *McDonald*.

DRENNEN, WITHEY, ATKINS, SCOTT, AND HOYT, *JJ.*, agree with this concurring opinion.

---

SIMPSON, *J.*, dissenting: Although I respect the majority's attempt to reconcile the decisions in *Primuth* and *McDonald*, I am not convinced; in my opinion, Mr. Carey's expenses of seeking reelection should be deductible. In general, I agree with the views of Judge Sterrett, but I would like to add the following comments.

To me, it is indisputable that the expenses of seeking reelection were incurred by Mr. Carey in his business; they were reasonable in amount and were incurred in an unsuccessful attempt to remain as president of the union. Since he was unsuccessful, they should all be deductible in the year when paid, and we need not consider whether, if he had been successful, they should all be deductible in a single year or should be charged off over the term of his office.

If a deduction for these business expenses is to be disallowed, it must be done on the basis that it is contrary to public policy to allow a deduction for such expenses. In *Commissioner* v. *Tellier*, 383 U.S. 687, 694 (1966), the Supreme Court reiterated the long-standing rule when it said, "Only where the allowance of a deduction would 'frustrate sharply

defined national or state policies proscribing particular types of conduct' have we upheld its disallowance." When a payment is contrary to law, such as a bribe or a kickback, to allow a deduction for such payment would clearly frustrate the policy which makes the payment illegal. Similarly, to allow a deduction for a fine or penalty would have the effect of mitigating the penalty and thereby undermine the law which provided the penalty. However, when we were faced with the question of the deductibility of payments in settlement of a claim for compensatory and punitive damages under the "False Claims Act," we held, in effect, that it was for the Congress, not the courts, to decide whether a deduction should be disallowed on the basis of public policy. *Grossman & Sons, Inc.*, 48 T.C. 15 (1967).

When Congress recently amended section 162 to provide that certain punitive damages were not deductible, it also included in the statute the rulings that certain other payments were not deductible because they were contrary to public policy. Sec. 902, Tax Reform Act of 1969. At that time, the report of the Senate Finance Committee included the statement that:

The provision for the denial of the deduction for payments in these situations which are deemed to violate public policy is intended to be all inclusive. Public policy, in other circumstances, generally is not sufficiently clearly defined to justify the disallowance of deductions. * * * [S. Rept. No. 91–552, 91st Cong., 1st Sess., p. 274 (1969), 1969–3 C.B. 423.]

The committee apparently felt that it was for Congress to decide when deductions should be denied for reasons of public policy, and I generally agree.

It is true that Congress has undertaken to regulate the conduct of union elections, but in those provisions, I see nothing indicating that the expenses of conducting an election should not be deductible for tax purposes. Clearly, anyone who seeks election to a union office is likely to incur expenses, and the payment of such expenses is surely not illegal. On the contrary, anyone who stands for such an office must present himself and his views for the consideration of the members of the union, and to do so is altogether consistent with our democratic traditions. If there is any risk that some candidates might engage in undue campaigning and incur excessive expenses in an attempt to secure union office, it seems to me that the appropriate remedy is not to disallow a deduction for all such expenses. So far, Congress has manifested no concern over such possibilities, but if it does become concerned, it can fashion a far more suitable remedy.

As a court, we have a responsibility to implement the general policies declared by the Congress, but here we have no policy declared by Congress. The majority of the Court has decided, for reasons of public policy, to deny a deduction for the expenses of seeking a union office.

I consider that a policy question which should be decided by the elected members of the Congress.

FAY, DAWSON, and STERRETT, *JJ.*, agree with this dissent.

---

STERRETT, *J.*, dissenting: I respectfully dissent from the holding reached by the majority for the reasons set forth below.

As has been made clear the issue here is the deductibility under section 162 of certain election expenses incurred in 1965 by petitioner James Carey. Paraphrased, section 162(a) allows a deduction for all expenses which are (1) ordinary and necessary, and (2) incurred in carrying on (3) a trade or business.

Treating these requirements in reverse order, it cannot be fairly disputed that petitioner was in the trade or business of being a labor leader. This conclusion is made apparent by reference to the majority's own Findings of Fact found on page 478 and I do not interpret its opinion to hold to the contrary. Further, such a determination is in accord with the many court decisions which have held that an individual may be in the trade or business of being a corporate executive. See *Trent* v. *Commissioner*, 291 F. 2d 669, 674 (C.A. 2, 1961), and cases cited therein.

Moving backward to (2) above, it has been frequently stated that "'carrying on any trade or business', within the contemplation of [sec. 162] * * * involves holding one's self out to others as engaged in the selling of goods or services." *Deputy* v. *duPont*, 308 U.S. 488, 499 (1940), concurring opinion of Justice Frankfurter. Since the early 1930's petitioner has held himself out to be a labor leader and has over the years engaged in continuous activities in furtherance of his trade in mostly elected, but some nonelected, capacities. That such service was at all times profitable in terms of receiving a salary can be safely assumed.

It seems clear, then, that the funds expended in 1965 were an integral part of his activities in carrying on his trade or business and bore the requisite nexus to income. Nothing could be less remote, no connection could be more taut than the relationship between election expenditures and the compensation accompanying the office sought. With his long success as a labor leader, petitioner could reasonably anticipate that any dollar spent in an election expense would result in his continuing to draw a salary as president of the union. Surely when an established labor leader campaigns for a union office, he is carrying on a basic element of his trade.

Finally, even though it is found that the expenses at issue were incurred by petitioner in carrying on his own trade, such expenses still must be ordinary and necessary to be deductible. Here, we must be

realistic, election expenditures are frequently the sine qua non of winning. Any income flowing from victory can, almost inevitably, be attributed in part to the campaign expenditures. To be "ordinary and necessary" the expenses must be reasonable. *Commissioner* v. *Lincoln Electric Co.*, 176 F. 2d 815 (C.A. 6, 1949). Petitioner deducted an amount of $16,070.22 as his share of the campaign expenses designed to reelect him to an office bearing a 2-year term with an annual salary of $25,500. The expenses in relation to the prospective income must be deemed reasonable. There was no effort here to "buy" an election, and the restriction on "reasonableness" would prevent anyone from deducting election expenses if there were such an effort.

The majority would position this case somewhere between *McDonald* v. *Commissioner*, 323 U.S. 57 (1944), and *David J. Primuth*, 54 T.C. 374 (1970). I view the case as being more between *McDonald, supra,* which disallowed a deduction for election expenses of a would-be judge, and *Graham* v. *Commissioner*, 326 F. 2d 878 (C.A. 4, 1964) [1], which allowed the deduction of proxy expenses designed in part to elect the taxpayer to a corporate board of directors.

The *McDonald* disallowance of election expenses incurred in running for public office has been interpreted as being based on public policy.[2] *Mays* v. *Bowers*, 201 F. 2d 401 (C.A. 4, 1953). See 4A Mertens, Law of Federal Income Taxation, sec. 25.21. Certainly, as the majority itself points out on page 480, the Supreme Court seemed to be limiting its opinion to the facts there at hand and leaving to other courts the detailed analysis of special circumstances.

Respondent, too, it would seem, has limited his application of *McDonald* to its facts. Certainly his acquiescence in *Furner* v. *Commissioner*, 393 F. 2d 292 (C.A. 7, 1968), as stated in Rev. Rul. 68–591, 1968–2 C.B. 73, recognizes that an employee's expenses, to be deductible, need not necessarily be related to any current employment. See also Rev. Rul. 60–223, 1960–1 C.B. 57.

The application of public policy considerations to disallow the deduction of otherwise allowable items should be restricted. For the future, at least, it has been, see S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 597, which accompanied the Tax Reform Act of 1969. There is no need to disallow the election expenses of a union official on the basis of public policy any more than those of a

---

[1] While the *Graham* case dealt with the deductibility under sec. 212 of the expenses there in issue, "No reason appears why a different construction should be given to the same language in Section 162(a)." *Locke Manufacturing Companies* v. *United States*, 237 F. Supp. 80, 87 (D. Conn. 1964). It must be conceded that the court in *Graham* discussed the question of deductibility mainly in terms of the taxpayer's stock holdings. Nevertheless, part of the expenses at issue related to his seeking election to the board of directors and, as noted above, were allowed.

[2] A review of the briefs filed with the Supreme Court reveals that the parties framed the issue as one involving public policy.

corporate officer. Unions are much like corporations. The majority emphasizes the governmental regulation of unions; the short answer to that is a reference to the Securities Exchange Commission as illustrative of the governmental regulation of the activities of corporations. Public policy considerations should be limited to campaign expenses incurred in running for public office.

In *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933), the Supreme Court, in discussing a predecessor of section 162, said: "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." Surely it is a way of life, in any effort to win a contested union election (or any contested election for that matter), to cast "honest bread" upon the waters, hoping to bring to shore the emoluments and other perquisites of the office at stake. Where the "cast" has been reasonable in amount and in furtherance of one's trade, there is no justification for ignoring the facts of life by denying the business nature of the expenditure. If the election effort proves unsuccessful the nature of the expenditures, obviously, has not been altered.

From the foregoing, it is apparent that I would allow the deduction at issue as readily falling within the scope of section 162(a).

FAY, DAWSON, SIMPSON, and QUEALY, *JJ.*, agree with this dissent.