ESTATE OF NELSON A. ROCKEFELLER, DECEASED, LAURANCE S. ROCKEFELLER, J. RICHARDSON DILWORTH, AND DONAL C. O'BRIEN, JR., EXECUTORS, AND MARGARETTA F. ROCKEFELLER, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4894–82. Filed September 24, 1984.

*Joseph M. Persinger* and *Stuart E. Keebler,* for the petitioners. *David M. Brandes,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $44,293 in the Federal income tax of Nelson

A. Rockefeller, deceased, and Margaretta F. Rockefeller for 1975. Petitioners in this proceeding allege that the determination was erroneous and claim an overpayment of income tax in the amount of $355,180 for that year. Other issues having been resolved, the only issue for decision is whether the legal fees and other expenses in the stipulated amount of $550,159.78 incurred and paid by Mr. Rockefeller in connection with his confirmation as Vice President of the United States, are deductible under either section 162(a) or section 162(e).[1]

All of the facts are stipulated.[2]

Petitioners Laurance S. Rockefeller, J. Richardson Dilworth, and Donal C. O'Brien, Jr., are executors of the will of Mr. Rockefeller, who died on January 27, 1979, a resident of Westchester County, NY. Petitioner Margaretta F. Rockefeller was the wife of Mr. Rockefeller both during the period here in controversy and at the time of his death.

When the petition was filed, Laurance A. Rockefeller was a legal resident of Pocantico Hills, NY; J. Richardson Dilworth was a legal resident of Princeton, NJ; Donal C. O'Brien, Jr., was a legal resident of New Canaan, CT; and Mrs. Rockefeller was a legal resident of Pocantico Hills, NY.

The joint income tax return of Mr. and Mrs. Rockefeller for 1975 was timely filed with the Internal Revenue Service Center, Philadelphia, PA. Mr. and Mrs. Rockefeller used a calendar year accounting period and reported their income in accordance with the cash receipts and disbursements method of accounting.

Mr. Rockefeller had a long and distinguished career in public service. Upon the resignation of President Nixon in 1974, Gerald R. Ford, then Vice President, became President, and the Office of Vice President became vacant. On August 20, 1974, President Ford nominated Mr. Rockefeller to serve as the Vice President. The nomination was made pursuant to section 2 of the 25th Amendment to the Constitution of the United States, which provides as follows:

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.
[2] This case was submitted to the Court by stipulation on Mar. 19, 1984, and was thereafter briefed by the parties.

Whenever there is a vacancy in the office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress.

Following his nomination, Mr. Rockefeller underwent lengthy and exhaustive investigations and examinations by several Federal agencies and two committees of Congress, the Judiciary Committee of the House of Representatives and the Committee on Rules and Administration of the Senate (the committees). The committees were charged with investigating the credentials, finances, public life, viewpoints on topical issues, and other qualifications of Mr. Rockefeller for the Office of Vice President.

Mr. Rockefeller's nomination as Vice President was confirmed by the U.S. Senate on December 10, 1974, and by the U.S. House of Representatives on December 19, 1974. Mr. Rockefeller was sworn in as Vice President of the United States on December 19, 1974. He served as Vice President until January 20, 1977.

In 1975, Mr. Rockefeller paid expenses in the amount of $550,159.78, all of which were incurred by reason of the investigations, examinations, and hearings in connection with his confirmation as Vice President. The expenses were incurred in responding to numerous requests by Federal agencies and the Congress for documents and information, and in preparing memoranda and testimony for, and in testifying before, the committees. The parties have stipulated that respondent does not contend that the expenses were excessive or unreasonable in relation to the services rendered.

The expenses in the amount of $550,159.78 consisted of the following:

| | |
|---|---|
| Legal and other professional services | $503,726.89 |
| Travel expenses | 17,764.35 |
| Printing of testimony and preparation of charts | 2,618.60 |
| Office temporary services | 10,224.53 |
| Office rentals[1] | 4,442.72 |
| Office machines and furniture rentals | 4,180.25 |
| Telephone and telegraph | 2,193.55 |
| Transcripts of hearings | 3,828.00 |
| Other expenses[2] | 1,180.89 |
| Total expenses | 550,159.78 |

[1] Office rentals and office machine and furniture rentals include amounts incurred to furnish separate, secure office facilities required by the Federal Bureau of Investigation, the Internal Revenue Service and Joint Committee on Internal Revenue Taxation, and the General Accounting Office.

[2] Other expenses include working luncheon and supper charges, taxi fares for those working late, delivery and shipping charges, press clipping services, and publications purchased.

Mr. and Mrs. Rockefeller's joint income tax return for 1975 discloses gross income of $4,479,437, charitable contributions of $1,328,562, and taxable income of $609,131. In addition, the return shows a deduction in the amount of $63,275, an amount equal to his salary as Vice President, for expenses incurred in connection with his confirmation hearings. Among other adjustments, not here in dispute, the notice of deficiency disallowed the deduction of the $63,275 with the following explanation:

It is determined that the deduction of $63,275.00 shown on your return as expenses in connection with confirmation as Vice President is not deductible because it has not been established that such expense is an ordinary and necessary business expense. Therefore, your taxable income is increased $63,275.

In the petition, petitioners allege that the full amount of $550,159.78 expended in the confirmation proceedings is deductible.

Petitioners contend that Mr. Rockefeller's confirmation hearing expenses are deductible under section 162(a) as ordinary and necessary business expenses. Alternatively, petitioners contend that the expenses are deductible under section 162(e) as ordinary and necessary expenses incurred in carrying on a trade or business in connection with appearances before committees of Congress.

Respondent maintains that the disputed expenses were not ordinary and necessary expenses paid in performing business duties, but were expenses paid in connection with Mr. Rockefeller's efforts to become Vice President of the United States, citing *McDonald v. Commissioner*, 323 U.S. 57 (1944), and its progeny. Alternatively, respondent contends that, because Mr. Rockefeller's expenditures so greatly exceeded the salary that he could earn, a profit motive was lacking and the principle of section 183(b) limiting the deduction to the amount of his salary applies.[3]

---

[3] There is no merit in respondent's alternative argument. The Board of Tax Appeals long ago allowed $1-a-year employees of the Government to deduct their actual ordinary and necessary

## 1. Deductibility of Expenses Paid in Carrying On a Business Under Section 162(a)

Section 162(a)[4] allows a deduction for "ordinary and necessary" expenses paid or incurred in the taxable year in "carrying on any trade or business." Section 7701(a)(26) provides that the term "trade or business" includes "the performance of the functions of a public office." These provisions clearly would allow all of the ordinary and necessary expenses paid by Mr. Rockefeller in carrying on the work of the Office of Vice President. *Frank v. United States*, 577 F.2d 93, 95–96 (9th Cir. 1978); *United States v. LeBlanc*, 278 F.2d 571, 574, 577 (5th Cir. 1960); *Jackling v. Commissioner*, 9 B.T.A. 312, 320 (1927). The expenses paid in connectin with Mr. Rockefeller's confirmation, however, were not incurred in the performance of his Vice Presidential functions; rather, they were incurred in the course of his efforts to attain the Office.

The principles of *McDonald v. Commissioner*, 323 U.S. 57 (1944), control. In that case, a judge was appointed to complete an unexpired term and agreed to become a candidate for the judgeship at the next election. To obtain the support of his party organization, he paid an "assessment" to his party's executive committee, and he incurred campaign expenses for advertising, printing, traveling, and the like. Denying a deduction for these "reelection" expenses, the Supreme Court explained the applicable law and its conclusion as follows (323 U.S. at 59–60):

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" are allowed by * * *

expenses in carrying out their duties. *Jackling v. Commissioner*, 9 B.T.A. 312 (1927); see also *Pollock v. Commissioner*, 10 B.T.A. 1297 (1928); *Brown v. Commissioner*, 13 B.T.A. 832 (1928). A similar conclusion was reached in *Frank v. United States*, 577 F.2d 93 (9th Cir. 1978), involving the expenses of a Senator's aide. After respondent's opening brief was filed, Rev. Rul. 84–110, 1984–30 I.R.B. 5, was published interpreting sec. 7701(a)(26) to provide an exception to the general profit motive requirement of a trade or business for public officeholders.

[4]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[section 162(a)] as deductions in computing net income. According to tax law terminology * * * [section 7701(a)(26)] the performance by petitioner of his judicial office constituted carrying on a "trade or business" within the terms of * * * [section 162(a)]. He was therefore entitled to deduct from his gross income all the "ordinary and necessary expenses" paid during 1939 in carrying on that "trade or business." He could, that is, deduct all expenses that related to the discharge of his functions as a judge. But his campaign contributions were not expenses incurred in being a judge but in trying to be a judge for the next 10 years. That is as true of the money he spent more immediately for his own reelection as it is of the "assessment" he paid into the party coffers for the success of his party's ticket. * * *

The *McDonald* opinion thus draws a distinction between expenses incurred in performing the functions of a public office and expenses paid in an effort to obtain the office. The opinion interprets section 162(a) to confine "deductible expenses solely to outlays in the efforts or services * * * from which the income flows." (323 U.S. at 60–61.)

The *McDonald* opinion has been followed to deny election and other related expense deductions in numerous subsequent cases, whether involving election or reelection to public office, and is now deeply ingrained in the tax law. *Shoyer v. United States*, 290 F.2d 817, 818 (3d. Cir. 1961); *Manes v. United States*, 367 F.2d 357, 358 (5th Cir. 1966); *Hakim v. Commissioner*, 512 F.2d 1379 (6th Cir. 1975), affg. per curiam a Memorandum Opinion of this Court; *Nichols v. Commissioner*, 511 F.2d 618, 620 (5th Cir. 1975), affg. 60 T.C. 236 (1973); *Levy v. United States*, 210 Ct. Cl. 97, 535 F.2d 47, 49–50 (1976); *Campbell v. Davenport*, 362 F.2d 624, 627 (5th Cir. 1966); *Mays v. Bowers*, 201 F.2d 401, 403 (4th Cir. 1953); *Martino v. Commissioner*, 62 T.C. 840, 844 (1974); see also *Carey v. Commissioner*, 460 F.2d 1259 (4th Cir. 1972), affg. 56 T.C. 477 (1971), involving the election expenses of an officer of a labor union.

We are fully aware, as petitioners emphasize, that the *McDonald* case involved an election, not a nomination-confirmation, and that the opinion may have been influenced by the sensitive policy problems that would arise from allowing deductions for election expenses. See, e.g., *Carey v. Commissioner*, 56 T.C. at 480. As discussed more fully below, however, equally difficult policy problems would arise in attempting to fashion a rule allowing deductions for nomination-confirmation expenses. We are constrained to follow the *McDonald* rule which was succinctly restated in *Diggs v. Commissioner*, 715

F.2d 245, 250 (6th Cir. 1983), affg. in part and revg. in part 76 T.C. 888 (1981), as follows:

*McDonald* and its progeny explicitly recognize that politicians perform many different functions. Each function, therefore, must be examined to determine whether it is related to the business of *being* an [officeholder] rather than of becoming one. * * *

Under this standard, it is clear that Mr. Rockefeller's expenses incurred in attaining congressional confirmation of his nomination as Vice President are not deductible.

Petitioners attempt to avoid the impact of the *McDonald* opinion by relying upon this Court's opinions in *Primuth v. Commissioner*, 54 T.C. 374 (1970); *Cremona v. Commissioner*, 58 T.C. 219 (1972); and *Black v. Commissioner*, 60 T.C. 108 (1973). In these cases, the Court allowed deductions for job-counseling agency fees incurred by employees in seeking work in their established fields of employment. *Primuth* involved a corporate executive; *Cremona*, a contract administrator; and *Black*, a corporation comptroller. In these cases, the Court held that employment agency fees paid in seeking new employment or a better job in a taxpayer's established field of work were incurred in carrying on his trade or business.

The phrase "trade or business," however, presupposes an existing business. *Stanton v. Commissioner*, 399 F.2d 326, 329 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Koons v. Commissioner*, 35 T.C. 1092, 1101 (1961); *Frank v. Commissioner*, 20 T.C. 511, 514 (1953). Where the taxpayer pays employment agency fees or incurs other expenses in seeking to move to a new job in a different field of employment, the fees are not deductible. *Carter v. Commissioner*, 51 T.C. 932, 934 (1969).[5]

Attempting to show that Mr. Rockefeller's confirmation expenses were incurred in an existing business, petitioners argue that he was in the business of holding public offices. Petitioners point to Mr. Rockefeller's long and distinguished career of holding public offices which began, according to his statement filed with the House Judiciary Committee, as early as 1930 with the Westchester County Board of Health. He held positions with the Federal Government which included Coordi-

[5]See also *Evans v. Commissioner*, T.C. Memo. 1981–413.

nator of Inter-American Affairs (1940–44), Assistant Secretary of State for American Republic Affairs (1944–45), Chairman of the Presidential Advisory Board on International Development (1950–51), Undersecretary of Health, Education and Welfare (1953–54), and Special Assistant to the President for International Affairs (1954–55). He served as Governor of New York (1958–73), and held the chairmanships of the two commissions, the Commission on Critical Choices for Americans and the National Commission on Water Quality[6] (1973–74), at the time of his nomination. Petitioners argue that under the *Primuth* line of cases, Mr. Rockefeller's confirmation expenses are deductible because the Office of Vice President was in his established field of the business of holding public offices. We do not agree.

We think that holding public offices is too amorphous a description to constitute a single trade or business within the *Primuth* principle. Public offices differ widely with respect to duties, responsibilities, tasks, and activities.[7] In Mr. Rockefeller's own career, his offices ranged from membership on a county commission to the Vice Presidency of the United States. As indicated above, some of his positions were with the Government of the State of New York; some were with the Federal Government. Each term as Governor of New York required a separate election. Each of his Federal Government positions required a separate appointment; at least two of them required Senate confirmation. There was no necessary relationship between the duties he performed in any two of the positions. Such private sector positions as corporate executive (*Primuth*), contract administrator (*Cremona*), and corporation comptroller (*Black*) are simply not analogous to the variety of

---

[6]Petitioners recognize that there is a question whether the chairmanship of these two commissions meets the definition of a public office laid down in *Frank v. United States*, 577 F.2d 93, 96 (9th Cir. 1978); *Green v. Bookwalter*, 207 F. Supp. 866, 873–874 (W.D. Mo. 1962), affd. 319 F.2d 631 (8th Cir. 1963), but argue that, in any event, Mr. Rockefeller had not lost his status, established over three decades, of being engaged in the trade or business of holding public offices. We need not deal with that issue.

[7]In *Davis v. Commissioner*, 65 T.C. 1014, 1019 (1976), the Court, in deciding whether an educational expenditure qualified the taxpayer for a "new trade or business" under the sec. 162(a) education expense regulations (sec. 1.162–5(b)(2), Income Tax Regs.), said:

"This Court has adopted a "commonsense approach" when we have been required to decide whether an educational expenditure qualified a taxpayer for a "new trade or business," and hence was nondeductible. * * * If substantial differences exist in the tasks and activities of various occupations or employments, then each such occupation or employment constitutes a separate trade or business. * * *"

public offices which Mr. Rockefeller held. Obtaining reemployment in such private sector positions involves considerations far different from receiving the nomination and obtaining confirmation under the 25th Amendment to serve as Vice President of the United States.

Indeed, the Office of Vice President is a unique position, political in nature, established by the Constitution of the United States, with vastly different tasks, activities, and responsibilities from the offices previously held by Mr. Rockefeller. The Vice President stands by to succeed the President in case of death, resignation, or removal from office (U.S. Const. art. II, sec. 1; amend. XXV, sec. 1). He holds the position of President of the Senate (U.S. Const. art. I, sec. 3) and serves as alter ego for the President of the United States on many occasions. In addition, the Vice President has, in recent years, carried a heavy load of responsibilities in the administration of the executive branch of the Government.[8]

In adopting the Joint Resolution leading to the 25th Amendment, the Congress recognized the essentially political nature of the Vice Presidential nomination-confirmation process. The reports of both the Senate and House committees contain the following similar paragraphs on section 2 dealing with filling a vacancy in the Office of Vice President:

Section 2 is intended to virtually assure us that the Nation will always possess a Vice President. It would require a President to nominate a person who meets the existing constitutional qualifications to be Vice President whenever a vacancy occurred in that office. The nominee would take office as Vice President once he had been confirmed by a majority vote in both Houses of the Congress. [S. Rept. 66, 89th Cong., 1st Sess. 14–15 (1965).]

It is without contest that the procedure for the selection of a Vice President must contemplate the assurance of a person who is compatible

---

[8]In explaining the Joint Resolution which led to the 25th Amendment, the accompanying reports dealing with sec. 2 include the following:

"In considering this section of the proposal, it was observed that the office of the Vice President has become one of the most important positions in our country. The days are long past when it was largely honorary and of little importance, as has been previously pointed out. For more than a decade the Vice President has borne specific and important responsibilities in the executive branch of Government. He has come to share and participate in the executive functioning of our Government, so that in the event of tragedy there would be no break in the informed exercise of executive authority. Never has this been more adequately exemplified than by the uninterrupted assumption of the Presidency by Lyndon B. Johnson."

H. Rept. 203, to accompany H.J. Res. 1, 89th Cong., 1st Sess. 14–15 (1965); S. Rept. 66, to accompany S.J. Res. 1, 89th Cong., 1st Sess. 14 (1965).

with the President. The importance of this compatibility is recognized in the modern practice of both major political parties in according the presidential candidate a voice in choosing his running mate subject to convention approval. This proposal would permit the President to choose his Vice President subject to congressional approval. In this way the country would be assured of a Vice President of the same political party as the President, someone who would presumably work in harmony with the basic policies of the President. [H. Rept. 203, 89th Cong., 1st Sess. 14–15 (1965).]

The assurance in these reports that the appointed Vice President will be of the same political party as the President, and the comparison of the Presidential candidate's voice in the selection of the Vice Presidential candidate "subject to convention approval" with the President's choice of his Vice President "subject to congressional approval" serve to underline the political nature of the appointment-confirmation process.

Consistent with this concept of the nomination-confirmation process, the Senate committee report recommending Mr. Rockefeller's confirmation refers to the responsibility imposed by the 25th Amendment as "substituting Congressional judgment for the usual national elective process." The hearings on the nomination, some of which were televised, disclose that Mr. Rockefeller was examined, and other witnesses testified, as to his record and views on virtually every domestic and foreign policy issue then current in the political world. The committee reports refer to editorials on the hearings and include numerous statements and letters pro and con on the nomination. The public perception created by the hearings obviously played a part in the final decision on Mr. Rockefeller's nomination to this political office.

To conclude that holding a series of public offices, including that of Vice President of the United States, is a single trade or business would raise other policy problems equally as difficult as the ones acknowledged in the *McDonald* opinion. It would mean that professional politicians or perennial office seekers would be entitled to deduct Senate or congressional confirmation expenses, whereas individuals appointed from the private sector would not. If deductions are to be allowed for expenses incurred in attaining congressional confirmation for public offices, it would appear that expenditures incurred in attaining nomination to such offices would likewise be deductible. If office seeking by a professional politician is part of the business of carrying on an office, it would appear that

expenses incurred for self promotion or "political self-aggrandizement" (*Diggs v. Commissioner*, 715 F.2d at 251)[9] in order to call himself to the attention of the appointing and confirming authorities, would also be deductible. Such expenses could span a career, and could include unsuccessful as well as successful attempts to obtain nominations or congressional confirmations. At given times, the most essential of such expenses may involve attendance at political conventions or political party contributions made as evidence of "party allegiance mixed or unmixed by a lively sense of future favor." *McDonald v. Commissioner, supra* at 60. The extent to which tax-deductible dollars are to be spent in attaining nominations and congressional confirmations is a policy issue which should be decided by Congress, not the courts. As the law now stands, the courts have no guidance on where to draw the line. Not until Congress provides that guidance should the courts sanction the allowance of deductions for expenses incurred in attaining public office. Cf. *Mays v. Bowers*, 201 F.2d at 403.

In the absence of any clear congressional mandate to the contrary, we join the Court in *Diggs v. Commissioner, supra* at 251, in rejecting "the analogy between seeking new employment and seeking new political office." We think the intent of the law as it now stands is served by the language of section 7701(a)(26): "The term 'trade or business' includes the performance of the functions of a public office." The section does not make the performance of the functions of a series of public offices a single trade or business. Rather, the performance of the functions of each public office is a trade or business. Accordingly, section 162(a), which authorizes deductions for carrying on a trade or business, does not support the deduction of Mr. Rockefeller's expenses in attaining confirmation as Vice President.

---

[9] In *Diggs v. Commissioner*, 715 F.2d 245, 253 (6th Cir. 1983), the Court held that a Congressman's expenses of attending a national political convention were not deductible, affg. on this issue 76 T.C. 888 (1981), because they were connected with his personal and party aggrandizement and "were not so directly connected with his trade or business as a legislator as to qualify for a sec. 162 deduction."

## 2. Section 162(e) Relating to Appearances
## With Respect to Legislation

Petitioners argue, alternatively, that section 162(e)[10] "explicitly allows deduction of the confirmation expenses." That section provides that the deduction allowed by subsection (a), which we have discussed above, shall include all the ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business" in direct connection with appearances before legislative committees. The section excludes from its reach participation in any political campaign and any attempt to influence the general public on legislative matters, elections, or referendums.

We do not think section 162(e) aids petitioners' cause. The legislative history of that section (added by the Revenue Act of 1962, Pub. L. 87–834, sec. 3(a), 76 Stat. 973, effective for taxable years beginning after Dec. 31, 1962) reveals that it was enacted in response to regulations adopted in 1959 following the Supreme Court's decision in *Cammarano v. United States,* and *F. Strauss & Sons, Inc. v. Commissioner,* 358 U.S. 498 (1959).[11] H. Rept. 1447, to accompany H.R. 10650, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 402, 420–422; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 703, 727–730. The Senate committee report (1962–3 C.B. at 727–728) describes the *Cammarano* decision as follows:

---

[10]SEC. 162. TRADE OR BUSINESS EXPENSES.

(e) APPEARANCES, ETC., WITH RESPECT TO LEGISLATION.—

(1) IN GENERAL.—The deduction allowed by subsection (a) shall include all the ordinary and necessary expenses (including, but not limited to, traveling expenses described in subsection (a)(2) and the cost of preparing testimony) paid or incurred during the taxable year in carrying on any trade or business—

(A) in direct connection with appearances before, submission of statements to, or sending communications to, the committees, or individual members, of Congress or of any legislative body of a State, a possession of the United States, or a political subdivision of any of the foregoing with respect to legislation or proposed legislation of direct interest to the taxpayer, * * *

\* \* \* \* \* \* \*

(2) LIMITATION.—The provisions of paragraph (1) shall not be construed as allowing the deduction of any amount paid or incurred (whether by way of contribution, gift, or otherwise)—

(A) for participation in, or intervention in, any political campaign on behalf of any candidate for public office, or

(B) in connection with any attempt to influence the general public, or segments thereof, with respect to legislative matters, elections, or referendums.

[11]See *Diggs v. Commissioner,* 76 T.C. 888, 893–895 (1981), affd. in part and revd. in part 715 F.2d 245, 248–249 (6th Cir. 1983); *Jordan v. Commissioner,* 60 T.C. 770, 772–774 (1973).

The Court held that although the amounts expended for legislative matters were "ordinary and necessary"—in fact essential to the very survival of the taxpayer's business—nevertheless they were not deductible because the regulations barred the deduction of this particular type of expense.

Pointing out the anomaly that expenses in connection with appearances before the judicial and executive branches of the Government were deductible "where the expenses otherwise qualify as trade or business expenses," the Congress decided "to place presentations to the legislative branch of government on substantially the same footing in this respect as that with the other two coordinate branches of government." H. Rept. 1447, *supra*, 1962–3 C.B. at 421.[12]

We think it apparent from the language of section 162(e) as well as the legislative history of the section that it is wholly inapplicable to Mr. Rockefeller's expenses in attaining confirmation by Congress of his nomination as Vice President; it applies only where the taxpayer is already engaged in the business in which the expenses are incurred. By its express language, the section applies only to expenses "paid or incurred during the taxable year in carrying on any trade or business." The committee reports, accompanying the enactment of the section, described above, show that the section was intended to authorize deductions which "otherwise qualify as trade or business expenses." The regulations explain that the section allows deductions for lobbying expenses with respect to specific legislative proposals "if they otherwise meet the requirements of the regulations under section 162." Sec. 1.162–20(c)(1), Income Tax Regs. Further, the courts have pointed out that the section allows deductions only "if they are

---

[12]The report explains the provision as follows:

"The expenses which may be deducted are divided into two categories. The first category relates to expenses in direct connection with appearances, submission of statements or sending of communications. These appearances, statements or communications may be presented either to committees or individual Members of Congress or to committees or individual members of State or local governmental legislatures. The second category of expenses which may be deducted are those in direct connection with the communication of information between the taxpayer and an organization of which he is a member. This communication of information may be either from the organization to the taxpayer or vice versa. In the case of both categories of expenses referred to above, in order for the expense item to be deductible, it must be concerned with legislation or proposed legislation of direct interest to the taxpayer (and to the organization in the latter case). Thus, the expenses may not be in connection with legislative matters such as nominations, etc., but rather must be in connection with specific legislation or proposals for legislation."

H. Rept. 1447, to accompany H.R. 10650, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 402, 422.

incurred in 'carrying on a trade or business,' " holding that the purchase and sale of stock "do not rise to the level of a 'trade or business.' " *Purvis v. Commissioner*, 530 F.2d 1332, 1334 (9th Cir. 1976), affg. a Memorandum Opinion of this Court.

Thus, section 162(e) imposes the same condition to deductibility as does section 162(a), i.e., that the expenses sought to be deducted must be incurred or paid in carrying on a trade or business. We have concluded above that Mr. Rockefeller's holding of a series of public offices during his long and distinguished career did not constitute a single trade or business; the performance of the functions of each public office was a separate business. We have also concluded that his congressional confirmation expenses were not incurred in carrying on the performance of the functions of the Office of the Vice President, but in seeking to attain that Office. Mr. Rockefeller's expenses in connection with the hearings are not, therefore, deductible under section 162(e).[13]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[13]The last sentence of the quotation from H. Rept. 1447, to accompany H.R. 10650, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 422, in note 12 *supra*, states that expenses, in order to be deductible, "may not be in connection with legislative matters such as nominations." Petitioners argue elaborately that this sentence was not intended to refer to a taxpayer's own nomination to office. This interpretation appears to be reasonable, but it merely points up the fact that sec. 162(e) has nothing to do with the issue here presented; the section authorizes deductions for lobbying undertaken in "carrying on" an existing trade or business, not one that the taxpayer wishes to enter.