762 F.2d 264
 56 A.F.T.R.2d 85-5094, 53 USLW 2620, 85-1
USTC P 9429
 ESTATE OF Nelson A. ROCKEFELLER, Deceased, Laurance S.
Rockefeller, J. Richardson Dilworth and Donal C.
O'Brien, Jr., Executors and Margaretta
F. Rockefeller, Appellants.
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
 No. 1041, Docket 84-4182.
 United States Court of Appeals,
Second Circuit.
 Argued April 22, 1985.
Decided May 24, 1985.
 
 William E. Jackson, New York City (Stuart E. Keebler, Joseph M. Persinger, Milbank, Tweed, Hadley & McCloy, New York City), for appellants.
 Glenn L. Archer, Jr., Asst. Atty. Gen., Washington, D.C. (Michael L. Paup, Richard Farber, Bruce R. Ellisen, Attys., Tax Div., Dept. of Justice, Washington, D.C.), for appellee.
 Before FEINBERG, Chief Judge, and FRIENDLY and NEWMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal by the Estate of Nelson A. Rockefeller and his widow[1] from a decision of the Tax Court, 83 T.C. 368 (1984), Featherston, J., presents a new variation on the old theme of what constitutes "ordinary and necessary expenses paid or incurred ... in carrying on any trade or business," I.R.C. Sec. 162(a), which are deductible in determining net income. Appellants contended that expenses incurred by Mr. Rockefeller in connection with the confirmation by the Senate and the House of Representatives, pursuant to the Twenty-Fifth Amendment, of his nomination to be Vice President of the United States were such expenses. The Commissioner of Internal Revenue denied this, the Tax Court agreed, and this appeal followed. We affirm.
 
 
 2
 The case arises as follows: Mr. Rockefeller incurred expenses of $550,159.78 in connection with the confirmation hearings in 1974, primarily for legal and other professional services. The Commissioner does not contend that the expenses were excessive or unreasonable in relation to the services rendered. In their joint income tax return for 1974, which showed a gross income of $4,479,437, Mr. and Mrs. Rockefeller claimed a deduction of $63,275--an amount of these expenses equal to his salary as Vice President during the year. When the Commissioner of Internal Revenue disallowed this deduction, Mr. Rockefeller's estate and Mrs. Rockefeller petitioned for review by the Tax Court and asserted that the entire amount of $550,159.78 was deductible as expenses of the trade or business of "performing the functions of public office."
 
 
 3
 The case was submitted on a rather meagre stipulation of facts which cited only Mr. Rockefeller's tenure as Governor of New York State between January 1959 and December 1973, when he resigned to devote his full time to the Commission on Critical Choices for Americans (1973-74) and the National Commission on Water Quality (1973-74), as showing the trade or business in which Mr. Rockefeller had engaged. However, copies of the hearings before and the reports of the Senate and House Committees on his nomination as Vice President were attached to the stipulation, and the Tax Court's opinion lists other positions held by Mr. Rockefeller referred to in these hearings, as follows: Coordinator of Inter-American Affairs (1940-44), Assistant Secretary of State for American Republic Affairs (1944-45), Chairman of the Presidential Advisory Board on International Development (1950-51), Undersecretary of Health, Education and Welfare (1953-54), and Special Assistant to the President for International Affairs (1954-55). 83 T.C. at 374-75.
 
 DISCUSSION
 
 4
 Decision turns on the interpretation of the familiar provision of I.R.C. Sec. 162(a), going back to the Revenue Act of 1918, which allows as a deduction
 
 
 5
 all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.
 
 
 6
 Also relevant is I.R.C. Sec. 7701(a)(26), adopted as Sec. 48(d) of the Revenue Act of 1934, 48 Stat. 680, 696, ch. 277, which says:
 
 
 7
 The term 'trade or business' includes the performance of the functions of a public office.[2]
 
 
 8
 Almost all discussions of the problem here at issue begin, and many of them end, with McDonald v. C.I.R., 323 U.S. 57, 65 S.Ct. 96, 89 L.Ed.2d 68 (1944), although in fact it sheds a most uncertain light. McDonald had been appointed to serve an unexpired term as judge on a Pennsylvania court, carrying an annual salary of $12,000, with the understanding that he would be a contestant in the ensuing primary and general elections for a full term of ten years. To obtain the support of his party organization, he was forced to pay an "assessment" of $8,000, which was to be used for the support of the entire ticket; he spent an additional $5,017.27 for expenses of his own campaign. The Commissioner disallowed the deduction of both amounts. The Tax Court affirmed, 1 T.C. 738 (1943), as did a sharply divided Supreme Court.[3] The bases for the decision are not altogether clear. At one point Justice Frankfurter emphasized that McDonald's "campaign contributions were not expenses incurred in being a judge but in trying to be a judge for the next ten years." 323 U.S. at 60, 65 S.Ct. at 97. Perhaps fearing that this being-becoming distinction would cut too widely, Justice Frankfurter elaborated other factors. One was that allowance of a deduction for the assessments paid by McDonald would lead to deductions by persons who were not candidates but paid "such 'assessments' out of party allegiance mixed or unmixed by a lively sense of future favors," id., a proposition which would not necessarily follow and which in any event would not explain the disallowance of McDonald's own campaign expenses. This was followed by a sentence, again emphasizing the being-becoming distinction but with a different thought added for good measure, 323 U.S. at 60-61, 65 S.Ct. at 97:
 
 
 9
 To determine allowable deductions by the different internal party arrangements for bearing the cost of political campaigns in the forty-eight states would disregard the explicit restrictions of Sec. 23 confining deductible expenses solely to outlays in the efforts or services--here the business of judging--from which the income flows. Compare Welch v. Helvering, 290 U.S. 111, 115-116 [54 S.Ct. 8, 9, 78 L.Ed.2d 212 (1933) ].
 
 
 10
 After disposing of arguments based on what are now I.R.C. Sec. 165 and Sec. 212(1), he continued with some observations concerning the increased public hostility to campaign contributions by "prospective officeholders, especially judges," and then concluded on two notes. One was that, 323 U.S. at 63-64, 65 S.Ct. at 98-99:
 
 
 11
 To find sanction in existing tax legislation for deduction of petitioner's campaign expenditures would necessarily require allowance of deduction for campaign expenditures by all candidates, whether incumbents seeking reelection or new contenders. To draw a distinction between outlays for reelection and those for election--to allow the former and disallow the latter--is unsupportable in reason. It is even more unsupportable in public policy to derive from what Congress has thus far enacted a handicap against candidates challenging existing office holders. And so we cannot recognize petitioner's claim on the score that he was a candidate for reelection.
 
 
 12
 (footnote omitted). The other was the desirability of according special deference to the Tax Court's determination on a matter of the sort sub judice, id. at 64-65, 65 S.Ct. at 99. The Supreme Court has not had subsequent occasion to revisit the field plowed in McDonald.
 
 
 13
 The courts have echoed the various themes sounded in McDonald. Some decisions have stressed the being-becoming distinction; see, e.g., Diggs v. C.I.R., 715 F.2d 245, 250 (6 Cir.1983). Others have emphasized the policy argument against deduction of campaign expenses, namely, that allowing such deductions would involve the whole community in partial subsidization of the electoral expenses of a particular candidate--a subsidy that would pay a larger amount of the campaign expenses of high than of low bracket candidates. See, e.g., James B. Carey, 56 T.C. 477, 479-81 (1971), aff'd per curiam, 460 F.2d 1259 (4 Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 325, 34 L.Ed.2d 257 (1972). The appellants distinguish the latter cases, stressing that the expenses here at issue were not incurred in an election in which Mr. Rockefeller was pitted against another citizen but in a confirmation in which he was the only candidate.[4] However, the policy argument in McDonald is only dubiously applicable to Campbell v. Davenport, 362 F.2d 624, 626 (5 Cir.1966), Nichols v. C.I.R., 511 F.2d 618 (5 Cir.) (en banc), cert. denied, 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975), and Levy v. United States, 535 F.2d 47, 26 Ct.Cl. 97, cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976), disallowing the deduction of small qualification fees payable by any candidate to his party to help to defray the costs of conducting the primary election and of which "[n]o part ... was used to espouse the causes of party candidates in the general election." Nichols, supra, 511 F.2d at 619. Further support for the Commissioner's position can be found in Joseph W. Martino, 62 T.C. 840, 844 (1974), disallowing deduction of legal fees incurred by a successful primary candidate in defending his victory against an election contest suit filed by his opponent; Martino, like Mr. Rockefeller, was not seeking the suffrage of the people as against another candidate.
 
 
 14
 Appellants' principal argument is that a post-McDonald decision of the Tax Court, in which the Commissioner has acquiesced, David J. Primuth, 54 T.C. 374 (1970), has undermined the being-becoming distinction. Primuth, the secretary-treasurer of a small corporation, Foundry Allied Industries, enlisted the aid of a "head-hunter" organization to find him a better job. This work resulted in his employment as "secretary-controller" of a company with greater geographical scope. The Tax Court held that the fees and expenses paid to the head-hunter organization were deductible under I.R.C. Sec. 162.
 
 
 15
 Judge Sterrett's opinion for a plurality took off from the proposition that "a taxpayer may be in the trade or business of being an employee, such as a corporate executive or manager," 54 T.C. at 377, rather than or in addition to the trade or business of holding a particular job, citing numerous cases including our own Hochschild v. C.I.R., 161 F.2d 817 (1947). With that established, Judge Sterrett believed that "the problem presented ... virtually dissolve[d] for it is difficult to think of a purer business expense than one incurred to permit such an individual to continue to carry on that very trade or business--albeit with a different corporate employer." 54 T.C. at 379. However, he proceeded to emphasize the relatively narrow scope of the decision, id.:
 
 
 16
 Furthermore, the expense had no personal overtones, led to no position requiring greater or different qualifications than the one given up, and did not result in the acquisition of any asset as that term has been used in our income tax laws. It was expended for the narrowest and most limited purpose. It was an expense which must be deemed ordinary and necessary from every realistic point of view in today's marketplace where corporate executives change employers with a noticeable degree of frequency. We have said before, and we say again, that the business expenses which an employee can incur in his own business are rare indeed. Virtually all his expenses will be incurred on behalf of, and in furtherance of, his corporate employer's business. What we have here, however, is an exception to that rule.
 
 
 17
 (footnote omitted). Judge Tannenwald, joined by three other judges, concurred: they were concerned over the "subtle distinctions" which they saw developing in the deduction of employment agency fees and suggested that "everyday meaning" should be the touchstone in interpreting Sec. 162. 54 T.C. at 382. In a separate concurring opinion, Judge Simpson took issue with language in the plurality opinion which he feared might confine the decision to cases where the taxpayer actually secured a new job. Id. at 383. Judge Featherston's concurrence placed greater weight on a Revenue Ruling that explicitly "allow[ed] deductions for fees paid to employment agencies for securing employment." Id. at 384. Six judges dissented. The Department of Justice rejected the Commissioner's request for an appeal and the Commissioner acquiesced in the result, 1972-2 Cum.Bul. 2 (1972).
 
 
 18
 In Leonard F. Cremona, 58 T.C. 219 (1972), a majority of the Tax Court rejected an attempt by the Commissioner to contain Primuth to cases where the employee had in fact obtained a new position. Again the Department of Justice declined a request to appeal and the Commissioner acquiesced, 1975-1 Cum.Bul. 1 (1975).
 
 
 19
 However, the erosion of the being-becoming distinction effected by Primuth and Cremona and the Commissioner's acquiescence in these decisions was partial only. The Tax Court, with the approval of the courts of appeals, has limited deductibility to cases where the taxpayer was seeking employment in the same trade or business. Moreover, the courts have insisted on a high degree of identity in deciding the issue of sameness.[5] Thus, in William D. Glenn, 62 T.C. 270 (1974), the court found that the broader scope of activities permitted in Tennessee to certified public accountants as compared with public accountants made the former a new trade or business and, in consequence, that the expense of taking a review course designed to assist the taxpayer in qualifying for certification was not deductible. Similarly, being a registered pharmacist constitutes a different trade or business than being an intern pharmacist, so that expenses of attending courses on pharmacology were not deductible, Gary Antzoulatos, T.C.Memo. 1975-327 (1975).[6] In Joel A. Sharon, 66 T.C. 515 (1976), aff'd, 591 F.2d 1273 (9 Cir.1978), cert. denied, 442 U.S. 941, 99 S.Ct. 2883, 61 L.Ed.2d 311 (1979), the Tax Court disallowed an IRS attorney's deductions for expenses related to taking the California bar examination. The court found that these expenditures would permit the taxpayer to engage in the new "trade or business" of the general practice of law in the State of California. The Ninth Circuit agreed with the Tax Court's reasoning that private practice involved "significantly different tasks and activities" from those required of an IRS lawyer, 591 F.2d at 1275. See, to the same effect, Joseph J. Vetrick, T.C. Memo. 1978-83 (1978), aff'd, 628 F.2d 885 (5 Cir.1980). The Tax Court has also disallowed a deduction for helicopter training expenses by an airline pilot. Edward C. Lee, T.C. Memo. 1981-26 (1981), aff'd on other grounds, Lee v. C.I.R., 723 F.2d 1424 (9 Cir.1984). The court found that "a helicopter pilot is in a different trade or business than is an airline pilot" and, since the taxpayer flew only fixed-wing aircraft in his current employment, "the helicopter flight training [led] to Mr. Lee's qualification in a new trade or business." Joseph Sorin Schneider, supra, T.C. Memo. 1983753 (1983), denied a deduction sought by a taxpayer who had resigned from the U.S. Army with a captain's commission and who later, after graduation, entered the business world as a consultant, for amounts spent in applying to graduate schools, in getting the graduate degrees of M.B.A. and M.P.A. at Harvard, and in seeking a summer job in Europe. The court said that the taxpayer's business had been that of an Army officer and rejected his claim that he had been in the business of being a "manager"--a claim strongly resembling the one made here that Mr. Rockefeller was in the business of being "a governmental executive."[7] In Roger Eugene Evans, T.C. Memo. 1981-413 (1981), the court denied a deduction for job seeking expenses to a taxpayer who had been in the Air Force for 22 1/2 years and had risen to the rank of Lieutenant Colonel and the post of special assistant to the commander of an Air Force base. The court was convinced that "petitioner's service as an Air Force officer cannot be compared to any employment he might have obtained outside the Air Force" and that while he "undoubtedly sought employment that would utilize the skills he had acquired during his military career, he [had] failed to show that there would not be substantial differences between the employment he sought to obtain in the private sector and his service as an Air Force officer." In sum, the Tax Court's decisions have adopted what Judge Tannenwald, in his concurring opinion in Primuth, characterized as "the simple test of comparing the position which the taxpayer occupied before and after the change," 54 T.C. at 382, and conform to the statement in Kenneth C. Davis, 65 T.C. 1014, 1019 (1976), that "[i]f substantial differences exist in the tasks and activities of various occupations or employments, then each such occupation or employment constitutes a separate trade or business."
 
 
 20
 Appellants' brief uses a number of different phrases to describe Mr. Rockefeller's trade or business at the time of his nomination to be Vice President--"an executive in federal and state governments" (p. 8); "an executive in public office" (p. 8); "an executive in public service" (p. 17); and "a governmental executive" (p. 22). In fact, the only public posts Mr. Rockefeller held at the time of his nomination were the chairmanships of two commissions, posts in which he had no executive duties. One of these, the National Commission on Water Quality was created by the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, to review water pollution control methods and issue a report to Congress recommending modifications. Although Mr. Rockefeller was elected chairman by the other members when he joined the Commission while still Governor of New York, the record reveals almost nothing about his activities there. The Commission on Critical Choices for Americans was an idea of Mr. Rockefeller's. It was not a governmental body, although its membership included some members of Congress and of the executive branch. Since federal funding was denied, the Commission was funded from private sources and foundation grants. If only these two activities were to be considered, it would be plain beyond all argument that holding the chairmanship of these Commissions and being Vice President are not the same trade or business but rather separate trades or businesses, if indeed membership on the commissions, particularly the Commission on Critical Choices, was a trade or business at all.[8]
 
 
 21
 However, a taxpayer who is unemployed when the expenses are incurred is "viewed as still engaged in the business of providing the type of services performed for [his] prior employer, unless 'there is a substantial lack of continuity between the time of [the employee's] past employment and the seeking of the new employment.' " 1 Bittker, Federal Taxation of Income, Estates and Gifts Sec. 20.4.6, at 20-85 to 20-86 (1981), quoting Rev.Rul. 75-120, 1975-1 Cum.Bul. 55, at 56; see, 4A Mertens, The Law of Federal Income Taxation Sec. 25.08, at 33 (1985) (taxpayer's "trade or business [does] not cease to exist during a reasonable period of transition"). See also Stephen G. Sherman, supra, T.C. Memo. 1977-301. Appellants urge that this principle allows us to look to Mr. Rockefeller's fifteen years of service as Governor of New York in considering whether the confirmation expenses on his nomination to be Vice President were in connection with the continuation of the same trade or business. We disagree, for two reasons. In order to take advantage of what is called the "hiatus" principle, a taxpayer must at least show that during the hiatus he intended to resume the same trade or business. See Sherman, supra, T.C. Memo. 1977-301. There is no such showing here. Mr. Rockefeller clearly did not intend to run again for Governor after having resigned that office after holding it for fifteen years. Indeed, the stipulation states that Mr. Rockefeller resigned the governorship "to devote his full time to the Chairs" of the two commissions, and there is nothing to suggest that he was contemplating holding executive public office again. The Vice Presidency became available only due to the resignation of President Nixon in the summer of 1974--an event that was not foreseeable until shortly before it occurred. We also cannot fault the Tax Court's holding that being governor of the second most populous state in the union and being Vice President of the United States are not the same trade or business in the narrow sense in which sameness has been consistently characterized. While there are certain areas of overlap, the governorship entails many duties--enforcement of the laws of the state, developing and promoting new laws, supervising a multitude of departments and agencies having thousands of employees and spending billions of dollars, proposing and securing the passage of a budget and the revenues needed to meet it, making appointments, and lobbying for the interests of the state with the Federal Government--which either find no counterparts in the Vice Presidency or find them only to the extent, usually quite limited, which the President has directed. On the other hand, the Vice Presidency involves many duties not found in the governorship of New York--presiding over the Senate, acting on behalf of the President on ceremonial occasions both within and without the United States, and executing special assignments by the President--not to speak of the Vice President's most important task, readying himself for the possibility of assuming the Presidency on a moment's notice. Although positions with somewhat different duties and responsibilities may be found to be within the same trade or business, whether in public or private employment, the Tax Court's finding that the Vice Presidency involved a trade or business for Mr. Rockefeller different from any in which he was engaged at the time of his nomination is not one that we are free to disturb, see I.R.C. Sec. 7482(a).
 
 
 22
 Appellants ask us to take a still broader view and consider Mr. Rockefeller as having been engaged in the same trade or business since his appointment as Coordinator of Inter-American Affairs in 1940. But the cases do not recognize a definition of "trade or business" wide enough to bring all Mr. Rockefeller's various posts within it. While there might be sufficient resemblance and continuity between the posts of Coordinator of Inter-American Affairs which Mr. Rockefeller held between 1940 and 1944 and that of Assistant Secretary of State for American Republic Affairs which he held between 1944 and 1945 to have qualified him as being in the business of being a public servant with special interest and expertise in Latin America, we see little resemblance between these positions and his service as Undersecretary of Health, Education and Welfare in 1953 and 1954 or as Governor of New York between 1959 and 1973. Furthermore there are substantial gaps between Mr. Rockefeller's various posts--five years between 1945 and 1950, one and one-half years between 1951 and 1953, three years between 1955 and 1958--far longer than the "hiatus" theory would recognize. See, e.g., Canter v. United States, 354 F.2d 352, 173 Ct.Cl. 723 (1965) (taxpayer who discontinued nursing activities for more than four years held not to retain status of being in the trade or business of nursing); Peter G. Corbett, 55 T.C. 884 (1971). See also Rev.Rul. 68-591, 1968-2 Cum.Bul. 73 (1968) ("Ordinarily, a suspension [of employment] for a period of a year or less, after which the taxpayer resumes the same ... trade or business, will be considered temporary"). Our reading of the record shows Mr. Rockefeller as a distinguished and public-spirited citizen, ready, for a third of a century, to put his great abilities at the disposal of the government in both appointive and elective office. While he was, of course, entitled to deduct unreimbursed expenses incurred in performing the functions of any of the many offices he held, I.R.C. Sec. 7701(a)(26), the Tax Court was warranted in holding that he had not engaged in any trade or business comparable to the Vice Presidency, within the rather narrow sense which the courts have reasonably given to the concept of identity. We therefore have no occasion to decide whether the "policy" reasons underlying the decisions disallowing expenses incurred in elections apply to expenses incurred in seeking confirmation to an appointive office which would seem to be properly regarded as the same trade or business,[9] or whether if they generally do not, there are special considerations for applying them to the unusual bicameral confirmation required by the Twenty-Fifth Amendment which the Commissioner characterizes as the equivalent of an election.
 
 
 23
 The judgment of the Tax Court is affirmed.
 
 
 
 [1]
 Mrs. Rockefeller's involvement arises solely because she and Mr. Rockefeller filed a joint return
 
 
 [2]
 The Senate and Conference Committee Reports describe this addition as "clerical" and "declaratory of existing law," S.Rep. No. 558, 73d Cong., 2d Sess. at 29; H.R.Rep. No. 1385, 73d Cong., 2d Sess. at 17 (Conference Report) (1934). A discussion before the Senate Committee on Finance suggests that the primary reason for the provision was to overcome doubts whether Senators were engaged in a "trade or business" so as to permit deduction for extra staff and telephone expenses. 1 Hearings before Committee on Finance on H.R. 7835, 73d Cong., 2d Sess. (March 6, 1934), p. 29-30. The Ninth Circuit has said that Sec. 48(d) was adopted to modify the general rule that "in order for an activity to be considered a trade or business under Section 162 it must be engaged in for profit." Frank v. United States, 577 F.2d 93, 95 (9 Cir.1978). The court cited Jackling v. C.I.R., 9 B.T.A. 312, 320 (1927), as the "best statement of the [existing] law" with respect to public officers, which the amendment was said to have codified. In Jackling, the Board of Tax Appeals allowed business deductions by a war-time government employee whose salary was only one dollar a year and rejected the Commissioner's argument that the expenses were not deductible because the taxpayer's employment was not profit motivated. Further support for this reading of Sec. 48(d) can be found in Revenue Ruling 55-109, 1955-1 Cum.Bul. 262 (1955), in which the Commissioner interpreted the section as allowing a public office to be treated as a trade or business "even though the incumbent thereof may serve without compensation, a factor which is ordinarily regarded as a prerequisite to the pursuit of a trade or business."
 
 
 [3]
 Justice Frankfurter delivered a plurality opinion for himself, Chief Justice Stone and Justices Roberts and Jackson. Justice Rutledge concurred in the result. Justice Black dissented for himself and Justices Reed, Douglas and Murphy. It may not be altogether accidental that three of the dissenters had held elective office, an experience not shared by any member of the plurality
 It should be noted that the dissenters did not disagree with the plurality's conclusion that the amounts were not "ordinary and necessary expenses of a trade or business"; they argued rather that the expenses came within what is now Sec. 212(1), adopted in 1942 to overrule Higgins v. C.I.R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941), which allowed deduction of "the ordinary and necessary expenses [of an individual] paid or incurred ... for the production or collection of income."
 
 
 [4]
 The force of this distinction between election and confirmation expenses is debatable. Mr. Rockefeller's expenses included not simply amounts incurred in preparing answers to questions of Senators and Representatives but also amounts incurred, with entire propriety, in convincing Congress that he was a good selection for Vice President. Nomination of Nelson A. Rockefeller to be Vice President of the United States: Hearings before the House Comm. on the Judiciary, 93d Cong., 2d Sess., pp. 1-3 (1974). While Mr. Rockefeller was not in direct contest with anyone, others were waiting in the wings if Congress was not so convinced. For reasons developed below, we are not required to pass on the force of the distinction
 
 
 [5]
 Most of these cases concerned education expenses, as to which there is a regulation, Treas.Reg. Sec. 1.162-5 (1960). This elaborates on the statute by defining a specific type of deductible expenses, Sec. 1.162-5(a)(2), and by prohibiting the deduction of expenses incurred in order to attain minimum educational requirements for a position, Sec. 1.162-5(b)(2), and expenses for a program of study leading to qualification in a new trade or business, Sec. 1.162-5(b)(3). However, the Tax Court cites education cases in decisions regarding other types of expenses incurred in obtaining a new position, see, e.g., Primuth, supra, 54 T.C. at 378; Joseph Sorin Schneider, T.C. Memo. 1983-753 (1983)
 
 
 [6]
 Although the court quoted Treas.Reg. Sec. 1.162-5, including the minimum educational requirement, Sec. 1.162-5(b)(2), it did not base its decision upon that section
 
 
 [7]
 The court distinguished Stephen G. Sherman, T.C.Memo. 1977-301 (1977), which had allowed deduction of expenses of attending the Harvard Business School by a taxpayer who had been employed as a civilian by the Army and Air Force Exchange Service as chief of its Plans and Programs office and, after graduating and applying unsuccessfully for reinstatement to his former job, was hired by private industry as a director of planning and research
 
 
 [8]
 The members of the Commission on Water Quality who were not officers or employees of the United States were paid by the Government on a per diem basis, 33 U.S.C. Sec. 1325(f); it does not appear whether Mr. Rockefeller accepted such payments, at least for the period when he was Governor of New York. The record is silent with respect to what salary, if any, was paid to Mr. Rockefeller as Chairman of the Commission on Critical Choices for Americans
 
 
 [9]
 E.g., a judge of a federal district court nominated to a court of appeals, a judge of a state court nominated to a federal court, or a foreign service officer nominated to be an ambassador