IVAN MAXIMILIAN NEUBAUER II AND MARIJA-TEREZIJA NEUBAUER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Neubauer v. Commissioner
Docket No. 17295-84.
United States Tax Court
T.C. Memo 1986-204; 1986 Tax Ct. Memo LEXIS 406; 51 T.C.M. (CCH) 1037; T.C.M. (RIA) 86204; May 20, 1986. Ivan Maximilian Neubauer II, pro se. Julia A. Caroff, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioners' *407 1980 Federal income tax in the amount of $528. The issues for decision are: (1) whether $1,673 in travel expenses are deductible by petitioners, (2) whether an additional $507 in travel expenses is deductible by petitioners, [1] and (3) whether $2,486 of expenses incurred in connection with Yugoslavian real property and improvements are deductible by petitioners. [2]
FINDINGS OF FACT Some *408 of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein. At the time they filed the petition herein, petitioners, Ivan M. Neubauer, II and Marija T. Neubauer, husband and wife, resided at 85 Bellarmine Dr., Rochester, Mich. They timely filed their 1980 joint Federal income tax return for 1980 with the Cincinnati Internal Revenue Service Center, using the cash method of accounting for that year. During, 1980, Ivan was an engineer employed by the Ford Motor Company. Maria was then a nurse assistant at Crittenton Hospital. Ivan also received some 1980 compensation as a soccer referee, and Marija distributed telephone directories for the Reuben H. Donnelly Corporation. The income from each of the latter two activities was reported on separate Schedule C's attached to petitioners' tax return. The schedule upon which Maria's income was reported recites the name American Enterprise International (AEI) [3] as the business to which it relates, naming "business development" as AEI's main business activity and "product distribution" as its product. The only income on the schedule is $50 from Maria's distribution of telephone *409 books. No income was reported from the sale of Amway products. Petitioners claimed deductions of $2,088. Of $1,813 claimed for travel and entertainment, respondent disallowed $1,673 [4] related to a summertime trip to Yugoslavia. [5]
Business and Employment Abroad
On December 18, 1979, the Industry for Motor Vehicles Novo Mesto in Yugoslavia wrote Ivan regarding "[y]our valued offer for employment," conditioning such employment on an *410 interview. Ivan was then a Ford Motor Company engineer. On Friday, June 20, 1980, Marija and her three children flew to Germany, then drove through Austria, where Marija was born, to Yugoslavia. Marija had not been to Austria or Yugoslavia since 1968. Because of a differing vacation schedule, Ivan left for Europe on June 27, 1980. The record is silent as to his prior trips, if any. Each of their flights involved a scheduled stop in New York both east and west bound. Taking petitioners' evidence at face value, we piece together Marija's activities in Europe as follows: [6]
Fri.
June 20
Travel to Yugoslavia
Sat.
June 21
Arrive in Frankfurt, Germany. Rent
car
Sun.
June 22
[7] No business Mon.
June 23
Amway presented to Fini &
Franc Hlebcar and 5 associates in
Austria
Tues.
June 24
Second Amway presentation to
Hlebcars; Crossed Yugoslav border
Wed.
June 25
No business; Go back to Austria
Thurs.
June 26
Amway presented to Hans & Ridi
Sauer and 4 associates in Austria
Fri.
June 27
Second Amway presentation to
Sauers
Sat.
June 28
Return to Yugosalvia. Return
car. Discuss business financing
with Ljubljana bank
Sun.
June 29
No business
Mon.
June 30
Further discuss financing with
Ljubjana bank
Tues.
July 1
With Ivan discussing auto part
import/export business
Wed.
July 2
No business
Thurs.
July 3
More import-export discussions
Fri.
July 4
No business
Sat.
July 5
No business
Sun.
July 6
No business
Mon.
July 7
Amway presentation to Sagadin
Valentin in Stuttgart, Germany
Tues.
July 8
Amway presentation to Sagadin
Valentin in Sestrze, Yugoslavia, at
his vacation home
Wed.
July 9
No business
Thurs.
July 10
Motorcycle/moped franchise
negotiations with Tomas, Koper
Fri.
July 11
More Tomas negotiations
Sat.
July 12
No business
Sun.
July 13
No business
Mon.
July 14
With Ivan to Agrostroj in Ljubljana
to discuss aluminum irrigation pipe
deal
Thes.
July 15
Amway presentation to Josef and
Stefka Korosec (vacationing in
Sestrze from West Germany)
Wed.
July 16
Further Amway presentation to
Korosecs
Thurs.
July 17
No business
Fri.
July 18
No business
Sat.
July 19
Travel to U.S.
Sun.
July 20
Travel to U.S.
*411 Taking petitioners' evidence at face value, we piece together Ivan's activities in Europe as follows: [8]
Fri.
June 27
Travel to Yugoslavia
Sat.
June 28
Travel to Yugoslavia
Sun.
June 29
Travel to Yugoslavia
Mon.
June 30
At Inter County Collective for
Employment
Tues.
July 1
At TAM (Maribor Factory for
Automobiles and Engines) to
discuss auto parts import/export
Wed.
July 2
No business
Thurs.
July 3
At Slavenian Emigrant Society,
Chamber of Commerce, Agrostroj,
and Employment Service.
Applied for engineering related
position.
Fri.
July 4
No business
Sat.
July 5
No business
Sun.
July 6
No business
Mon.
July 7
Amway presentation to Sagadin
Valentin in Stuttgart, Germany
Tues.
July 8
Amway presentation to Sagadin
Valentin in Sestrze, Yugoslavia, at
his vacation home
Wed.
July 9
No business
Thurs.
July 10
Outboard/moped franchise
negotiations with Tomos, Kopor
Fri.
July 11
Outboard/moped franchise
negotiations with Tomos, Kopor
Sat.
July 12
No business
Sun.
July 13
No business
Mon.
July 14
In Ljubljana, at Agrostroj
Tues.
July 15
Filed application with
personnel services at
Hidromontaza
Wed.
July 16
At TAM (Factory for
Automobiles and Engines)
Thurs.
July 17
Interview for engineer-manager
at IMV (Industry for Motor
Vehicles)
Fri.
July 18
Discussed employment with
Zrece Forging Industry
Sat.
July 19
Talks with Maribor Foundry
regarding bronze castings for
automotive applications
Sun.
July 20
No business
Mon.
July 21
Discussed Amway with Josef and
Stefka Korosec at their summer
home in Sestrze.
Tues.
July 22
Made travel arrangements to
return to U.S.
Wed.
July 23
No business
Thurs.
July 24
No business
Fri.
July 25
IMV (Industry for Motor
Vehicles)
Sat.
July 26
Went to Agrostroj in
response to a cable
Sun.
July 27
No business
Mon.
July 28
Went to Zrece Forging Industry
in response to a cable
re: employment. Discussions also
held regarding import/export of
hand tools.
Tues.
July 29
Arranged return trip
Wed.
July 30
Travel to U.S.
Thurs.
July 31
Travel to U.S.
*412 While in Yugoslavia, Ivan received a letter dated July 18, 1980, from Agrostroj, Ljubljana (an "Enterprise for Manufacturing and Repair of Agricultural and Forestry Mechanization"). That letter answered Ivan's inquiry regarding employment in Morocco, and gave details if Ivan wished to further pursue the matter. In the United States, Ivan received another letter from Agrostroj dated August 27, 1980. This second letter contained an offer of employment as a process engineer including 5-year occupancy of a three-bedroom condominium, apparently the hallmark of an executive position in Yugoslavia. By letter of September 30, 1980, the Unior Zrece Forging Industry wrote Ivan at a post office box in Troy, Michigan, also with an offer of employment including a three-bedroom condominium. This offer stated the available job was in the process design department of the machine building division, and explained that division's *413 work in some detail. Ivan would not be working with automobiles at Unior, except that his division would make some forgoings for the auto industry. Finally, by letter of October 6, 1980, IMV Industry for Motor Vehicles Novo Mesto wrote Ivan at his post office box with an offer of employment including a three-bedroom condominium. This offer described Ivan's work as involving introduction of new programs from cooperation with Renault. Despite testimony that he was job-hunting and open to relocating in Yugoslavia, Ivan rejected all these offers. Ivan discussed importing mopeds and outboard motors with Tomos, Incorporated but because of high interest rates, no deal was struck. Negotiations regarding auto parts, and presumably those regarding irrigation pipes fell through for the same reason. Petitioners introduced into evidence an Application for Amway Distributor Authorization dated February 18, 1980, which they both signed, and an Amway Distributor Identification Card issued in their names for the year 1980. Also admitted were business cards and an undated Amway order form for an "SDP Kit" which is the $55.75 start-up kit all Amway distributors must buy to familiarize themselves *414 with and demonstrate the Amway household products available for sale. Petitioners' personal use of these products occurred when they were getting acquainted with the products and when they used up bottles too empty to present to customers. Petitioners, believing their area was saturated with Amway distributors, tried to expand their Amway business when they were in Europe. Amway had established a network in Japan and Germany, and petitioners brought to Europe with them Amway literature specially made for Germany and Austria. Although petitioners could not name the person, they stated they "sponsored" [9] someone as a European Amway distributor. No money was ever received from that party, however. Marija explained this saying "[t]hey did not pursue it any further," and "they would have to go back to the people in Germany that were in charge of that distribution." [10] Ivan explained this saying "[t]hey never made it big enough." *415 Having made no headway internationally or, apparently, domestically, petitioners got out of the Amway business in the end of 1980. Thus, as was the case with Ivan's interest in returning to work abroad, petitioners' Amway activity waned shortly after they returned from Europe. No contracts were signed or products or services sold by petitioners while they were in Europe, with the possible exception relating the Amway noted above. In short, business may have been discussed, but none was consummated. The Neubauer Property
Ivan owns a residential house situated on tilled field, forest and meadow lands totaling about 10 acres in Sestrze County, Yugoslavia. The property is improved with a barn, stables and a garage, all of solid brick construction. Ivan acquired this property pursuant to a deed of trust contract dated October 25, 1975, for a price of $60,000, divided $50,000 for the buildings and $10,000 for the land. [11] The property is identified by its land parcel numbers in the Register of Land Deeds for Sestrze County; [12] the only address shown there is "Sestrze 3." No deed [13] or contract of sale is in the record, [14] despite the presence of many other less important *416 Yugoslavian documents relating to the property. [15]
Before Ivan acquired the property, his mother, Alojzija Neubauer, lived there intermittently. At the time of acquisition, she lived across *417 the street from the property, with her sister. After the acquisition, around October 1975, she moved back to the property, but left soon after. [16]
Around October 20, 1975 Ivan's nephew, Vinko Sagadin, moved in. He stayed until the end of 1977. Ivan allegedly charged Sagadin rent of $2,000 a year plus taxes and utilities, but Sagadin actually paid nothing. Instead, Ivan "gave him an interest free loan." Sagadin was a blacksmith who used the property for his trade as well as residence. Some of the amount Ivan "lent" Sagadin was later paid in the form of work Sagadin did on the house. When Sagadin left the property at the end of 1977, Ivan's mother Alojzija, moved back in. Ivan testified that since that time he tried to rent the property by word of mouth and a posted sign. He testified these were customary methods. He further testified that according to local custom and practice, the caretaker of real estate normally does not have to pay anything for rent over and above provided caretaker services. [17] The mere obligation to provide these services, *418 however, proved a sufficient rental disincentive, Ivan stated, to keep the property unrented to anyone other than Alojzija Neubauer. [18]
The only 1980 compensation which appears in the record from Alojzija Neubauer for use of the property is her payment of $166 in taxes and insurance on the property. [19] Petitioner offered no evidence of what comparable properties in the area rent for. *419 As of June 4, 1981, the Counties of Ptuj and Ormoz officially announced the construction of the "Accumulation Medvedce," apparently a water reservoir. According to the announcement, the reservoir was to straddle two counties, Ptuj and Solvenska Bistrica. [20] Ivan testified that he knew in 1975, at the time of his purchase of the property, that this reservoir was planned. He further testified that the reservoir referred to in the bulletin was to be near his property, that the reservoir would be a "most important development," and that as a result of economic circumstances the reservoir had not yet at the time of trial been constructed. Finally, Ivan testified that the property was bought with the intention of making a profit [21] through either its rental to vacationers and tourists after the reservoir was built or its potential sale for construction of cottages or recreational facilities. No independent evidence is in the record indicating that the reservoir would be available for recreational use, or that the forthcoming development was such that it could be expected to bring increased recreational use to the area. [22]
*420 Petitioners introduced into evidence copies of three checks, issued approximately quarterly beginning in January, 1980 to Ivan's mother in amounts of $200, $300 and $500. Ivan testified that these were cashed, and the cash used to pay laborers who improved the house in Sestrze County. Pages of a diary bearing notations of income and expense for the property were also introduced. For example, the annual rental payments Vinko Sagadin owed are shown. Also, notations described the purposes to which the above checks were to be put: the $200 check was an advance for window shutter repair; the $300 check was to cover the balance of the shutter repair and painting and to provide a $50 advance for other repairs; the $500 check was to allow Ivan's mother to begin a major remodeling to include installation of a toilet, bathtub, water heater, space heater, and septic tank and all necessary plumbing. [23] Although Ivan testified to the contrary, each diary entry appears to have been made contemporaneously with the others, although the diary covers transactions purportedly occurring over five years. *421 Ivan testified that he and Marija were in Europe to inspect their investment property for the purpose of safeguarding and maintaining it. He testified further than $7,500 in capital improvements and $450 in repairs have been made on the property. He stated $4,500 of the capital improvement was done during the 1980 trip, and all of the $450 in repairs were expenses incurred in 1980. The only independent corroborative evidence supporting Ivan's testimony on these points was the copy of the three checks and the diary. When petitioners were in Sestrze, they spent an unspecified number of evenings working on the improvements or repairs and an unspecified amount of time supervising the laborers. OPINION Petitioners justify deductions for the costs of their trip, both those challenged in the petition and those first raised on brief, by stating their trip was business related. They identify four business reasons for the trip: to develop import/export business, to develop Amway business, to seek employment, and to safeguard and maintain their business property. Respondent counters that the primary purpose of the trip was personal, that petitioners had neither any trade or business *422 outside their regular employment during 1980, nor any existing business investments to which the expenses could be related, and that if any business was conducted it was, at best, minor and incidental. In any event, respondent continues, petitioners have failed to allocate any of their expenditures between business and personal expenses. Petitioners claim the Sestrze property was acquired and held for the production of income. Respondent argues that because the property was used by Ivan's mother throughout the year for less than a fair rental, any loss deductions which might otherwise be available are denied. We initially address the items first raised on brief. Under Rule 34(b)(4)[24], "Any issue not raised in the [petition] shall be deemed to be conceded." This Court recently held in a context similar to this that where a party would be prejudiced by an adverse party's first raising a legal theory on brief, the theory is not properly before the Court. Johnson v. Commissioner,83 T.C. 103, 119-121 (1984). The rationale for the rule is that the party may have been *423 able to mount sufficient evidence to prevail under the new theory or rebut the new matter, had he been apprised of it in sufficient time. We therefore do not consider the $507 in expenses first claimed by petitioners on brief. [25]
We next address the deductions disallowed in the notice of deficiency. Deductions are a matter of legislative grace and petitioners must establish their entitlement thereto. New Colonial Ice v. Helvering,292 U.S. 435 (1934); Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Ordinary and necessary traveling expenses incurred while away from home in the pursuit of a trade or business are deductible. Sec. 162. Moreover, ordinary and necessary expenses incurred for the production or collection *424 of income or for the management, conservation or maintenance of property held for the production of income are deductible. Sec. 212. Expenses, however, which are incurred preparatory to entering a business are not deductible are expenses incurred in pursuit of a trade or business under section 162. Estate of Rockefeller v. Commissioner,83 T.C. 368 (1984), affd. 762 F.2d 264 (2d Cir. 1985), cert. denied 106 S.Ct. 604 (1985); Frank v. Commissioner,20 T.C. 511 (1953) (predecessor of section 162). Likewise, no expense in respect of a preliminary search for a potential business opportunity is allowed as a deductible expenditure under section 212. Dean v. Commissioner,56 T.C. 895 (1971); Frank v. Commissioner,supra (predecessor of section 212). Petitioners' import-export business activities fall squarely within the above-stated rules. Their travel expenses are not deductible under the theory that they were incurred in connection with that business. Petitioners present a slightly more appealing case with the Amway argument. Here, they have some evidence to corroborate their *425 testimony. That evidence, however, including an application for an Amway distributorship, business cards and an invoice showing the purchase of a sample kit, falls short of showing that their activities were anything more than in preparation for a business which was ultimately abandoned. [26]
Moreover, we take note of the relationships between petitioners and their Amway targets. [27] We also note that Amway presentations were made to each potential customer not once, but on two or three separate occasions. We give little weight to the evidence regarding the business purpose of the visits described. The *426 above result is not changed by virtue of the fact that petitioners may have been holding themselves out as operating under the name of AEI, which may have had income prior to the trip. [28] See Estate of Rockefeller v. Commissioner,supra (being governor different business from being vice-president); O'Donnell v. Commissioner,62 T.C. 781 (1974), affd. without published opinion 519 F.2d 1406 (7th Cir. 1975) (rejecting integration of related activities). We next turn to petitioners' reliance on Ivan's job-seeking activities. We first note that petitioners have not claimed that this justification supports deductions for Marija's expenses. It could not. Duncan v. Commissioner,30 T.C. 386 (1958). We therefore confine our examination to whether Ivan's limousine, plane and train fares are deductible under this theory. *427 Generally, expenses incurred in seeking employment in the same trade or business are deductible under section 162(a). Primuth v. Commissioner,54 T.C. 374 (1970). However, to obtain a section 162(a) deduction for their expenses in traveling to and from Europe, petitioners must show the expenses were directly attributable to the business of the taxpayer. Section 1.162-1(a), Income Tax Regs. See also Sholund v. Commissioner,50 T.C. 503 (1968). [29]
We have carefully perused the record and conclude that petitioners' trip was primarily personal. Much of the time spent was with family and friends or acquaintances. Our observations above regarding petitioners' Amway activities are relevant here. Moreover, petitioners offered no specific reasons why Ivan rejected all three of his employment offers. Based on our observations of petitioners at trial, and the entire record, we conclude that Ivan's job-seeking activities were not good faith attempts to find alternative employment, but casual inquiries, made because petitioners thought they would *428 support their tax deduction claims. Ivan's claimed travel expenses are not deductible as related to employment-seeking. [30]
We next turn to petitioners' last justification for their travel expenses, that they were incurred in connection with their Yugoslavian property. Since resolution of this issue involves principles also relevant to the allowability of the loss deduction petitioners claimed on their property, we discuss the two issues together. In Johnson v. Commissioner,59 T.C. 791 (1973), affd. without discussion of this point 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974), we set out the principles that govern the question of whether expenses incurred in connection with holding property are deductible. We adopt much of the immediately following discussion from that case. The holding of a single property for rent may constitute a trade or business, LaGreide v. Commissioner,23 T.C. 508, 512 (1954); *429 Hazard v. Commissioner,7 T.C. 372 (1946). Moreover, property held for rental purposes may be held for the production of income within the provisions of section 212. Horrmann v. Commissioner,17 T.C. 903 (1951). In determining whether the holding of property for rental is a trade or business within the meaning of section 162, or is a holding of property for the production of income within the meaning of section 212, the intention of the taxpayers as to the use of the property is of paramount importance. Petitioners' activities must be "sufficiently systematic and continuous to place [them] in the business of real estate rental," before section 162 will apply. Curphey v. Commissioner,73 T.C. 766, 775 (1980). In this case, petitioners' activities with respect to their real estate were not shown to be any more than isolated. Petitioners were not in the real estate business. [31]
*430 In order then for petitioners to recover they must demonstrate they had a profit-seeking motive in acquiring and holding the property. If the predominant purpose and use of the property was for some nonprofit motive, rather than to derive income, they are not entitled to the deductions claimed. Carkhuff v. Commissioner,425 F.2d 1400 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; sec. 1.212-1(c), Income Tax Regs. See also Schley v. Commissioner,375 F.2d 747 (2d Cir. 1967), affg. a Memorandum Opinion of this Court; Rand v. Commissioner,34 T.C. 1146, 1150 (1960). Whether petitioners acquired and held the property for rent primarily for the purpose of making a profit is a question of fact to be determined from all the facts and circumstances of the case. No single factor is controlling but greater weight is to be given to objective facts than to the taxpayer's mere expression of intent. Johnson v. Commissioner, *431 supra.
The objective evidence offered to corroborate Ivan's testimony on profit motive was inadequate. Petitioner's strongest evidence, testimony of a $2,000 annual rental payment, was insufficiently corroborated, and in any event conflicted with testimony that mere property maintenance was fair rental. [32] No other evidence of fair market rental was introduced. Testimony was offered that Ivan's mother lived on the property only because no renters could be found, yet only word of mouth advertising and sign posting was used to alert potential lessees. This is patently inadequate in an area which drew vacationers (before any reservoir was built) from across two international borders. [33] Ivan's testimony that he knew of the reservoir in 1975 is not corroborated by a 1980 announcement of its construction. Moreover, no documentary evidence linked the reservoir to increased rental prospects. *432 We do not think that Ivan had profit on his mind when he bought the property. Ivan may have bailed out poorer relatives to keep the property in the family, [34] or sought to provide a home for his mother. We believe this is a noble gesture. Unfortunately, the reward for it cannot come from the U.S. Treasury. No deduction for travel expenses relative to the property are allowable under section 212. We now turn to petitioners' claimed losses. Section 262 prevents deductions for family expenses. Again, Ivan's good deed in buying property for his mother to live in is recognized. Expenses incurred in connection therewith, however, are nondeductible under section 262. Respondent is correct that no loss deduction should be allowed. Decision will be entered for respondent.
Footnotes
1. This $507 deduction, not claimed on any tax return or amended return, or in the petition, is contended for on brief for the first time. Although some Yugoslavian train tickets, apparently a component of this claim, are in the record, we are afforded no itemization of which expenses comprise this $507. ↩
2. Petitioners claim in their petition and on a Form 1040X amended income tax return an $800 overpayment resulting from recomputations due to a net operating loss (NOL) in the amount of $2,486. Although not mentioned in the notice of deficiency, respondent contests the relevant deductions on brief. They are itemized in petitioners' amended tax return as follows: $2,161 depreciation; $450 general repairs; $40 insurance; $1 postage. Petitioners reported $166 of income from the property.↩
3. Petitioners filed for AEI a Certificate of Persons Doing Business Under an Assumed Name with the Michigan authorities. ↩
4. The disallowed expenses, stipulated as having been incurred by petitioners, follow: ↩
Ivan's limousine to
airport, 6/27/80
$ 11.85
two round-trip airline tickets
to Frankfurt, Germany
1,096.00
Marija's car rental
330.00
gasoline
76.90
mileage charges
73.25
Ivan's train ticket
to Frankfurt
85.00
Total
$1,673.00
5. Respondent's reasons for allowing the balance of the travel and entertainment expenses, presumably related to the same businesses as the disallowed expenses, do not appear of record. We note the possible inconsistent position, however, as to the existence of a business.↩
6. The itinerary is taken largely from a copy of Marija's personal diary. The original was lost while she was making copies. ↩
7. For itinerary purposes, we deem no business to have been done on days so indicated in the diaries, on days for which there are no diary entries and on days for which the diaries detail no Amway, import/export or job seeking activities.↩
8. The itinerary is taken largely from a translation of a copy of Ivan's personal diary. Marija lost the original when she was making copies. Moreover, although Ivan testified that he only helped a Yugoslavian translator, he signed the translation as the translator.↩
9. We are not informed as to what "sponsoring" means in the Amway vernacular. ↩
10. No explanation was offered to show why, if German customers had to purchase from German distributors, petitioners did not learn this information before they left for Europe.↩
11. The transaction was handled for Ivan by his brother-in-law, a Yugoslavian attorney who held Ivan's power of attorney. ↩
12. We note that except for this, the most authoritative evidence of ownership petitioners produced, all other references in the record locate the property in Ptuj County. ↩
13. Ivan testified that the document signed on a transfer of property in Yugoslavia is physically placed in the official court records, and that he has never seen the document signed on the transfer of his property. This was signed by his Yugoslavian attorney. See n. 11, above. ↩
14. From whom Ivan acquired title is, therefore, unclear. Ivan testified that he bought the property from his step-sister and two other sisters. However, the Power of Attorney petitioner introduced in evidence authorizes Ivan's brother-in-law to buy for Ivan the property from "Neubauer Alojzija, born Frangez." Ivan's mother's name is Alojzija Neubauer. ↩
15. For example, records of insurance and taxes for the property.↩
16. The record is silent regarding what, if any, rent was being paid during these periods of residency by Ivan's mother.↩
17. Ivan testified as to the existence of a Yugoslavian law requiring the fields to be worked as a condition of ownership. The record does not disclose to what extent Vinko Sagadin complied with this law while paying $2,000 more rent annually than Ivan's mother and↩ conducting his own blacksmithing business. We likewise are uninformed about who tended the fields before Sagadin moved in. 18. Moreover, Ivan testified that, unlike Americans, Yugoslavians don't move around much.↩
19. Ivan testified that this was $166 morethan↩ the fair market value, if the tenant cared for the lands. We note that the insurance statement in the record shows coverage only from September 17, 1980. Since the record is silent as to events since 1980, we are uninformed as to whether Ivan's mother paid more than $166 in 1981 or later years because of greater insurance coverage.
20. We note that the register of land deeds in which the subject property was scheduled is the Register of Land Deeds for Sestrze↩ County. See n. 12, above. 21. Ivan anticipated a few loss years until the reservoir was completed. ↩
22. We note, however, that petitioners' itineraries show that at least two parties, the Korosecs and Sagadin Valentin, were vacationing from Germany in Sestrze priorto↩ the reservoir being built.
23. Also noted in the diary was that additional remodeling funds came from those on deposit with Ivan's brother-in-law ($3,500) and those owed by Vinko Sagadin ($450). The diary also states that Vinko Sagadin repaid the balance of his interest-free loan ($2,950) to Ivan, which the latter brought back to America with him after his trip to Yugoslavia, described above. We are uninformed whether Ivan took his cousin's rental payments into income at this, or any other time. They are not reflected on petitioners' 1980 return.↩
24. All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. ↩
25. See Rabb v. Commissioner,T.C. Memo. 1972-119; Tolins v. Commissioner,T.C. Memo. 1963-34↩.
26. See Fryer v. Commissioner,T.C. Memo. 1974-77 (European trip not deductible even where orders placed and agreements reached); Sheban v. Commissioner,T.C. Memo. 1970-163↩ (no deduction even where option to buy property signed).
27. The Hlebcars and Sauers were relatives of Marija and the Korosecs long time acquaintances. Although the record does not reveal the relationship of Sagadin Valentin, we note that Vinko Sagadin is a relative of Ivan's, and names appear to have been inverted elsewhere in this record. See n. 14, above.↩
28. Since not before us, we express no opinion as to the propriety of scheduling income from Marija's distribution activities on a Schedule C, or as to the potential for the expenses involved here to be capitalized or amortized.↩
29. See also Brotman v. Commissioner,T.C. Memo. 1977-65↩.
30. Even if the fares were deductible under sec. 162↩, they would be limited under sec. 274, and the regulations thereunder.
31. See Wesa v. Commissioner,T.C. Memo. 1982-155↩ (Despite newspaper advertisements and actual rentals in subsequent years, no trade or business).
32. The record does not reveal whether Ivan's cousin provided the required maintenance services while running his blacksmith business. See n. 17, above. Also we note that rental payments were allegedly charged in round numbers of dollars, not Yugoslavian dinars. ↩
33. See n. 22, above. Austria separates Yugoslavia from West Germany.↩
34. Ivan testified that "everybody has been paid off" by his purchase of the property.↩